NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0205n.06
CASE NO. 16-1919

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DARYL SAMPSON, | ) | **FILED** |
| | ) | Apr 06, 2017 |
| *Plaintiff-Appellant*, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| VILLAGE of MACKINAW CITY, *et al.*, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| *Defendants-Appellees*. | ) | |
| | ) | |

Before: KEITH, BATCHELDER, and McKEAGUE, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** In this appeal, plaintiff Daryl Sampson challenges the district court's grant of summary judgment to defendants Robert Klave (a Mackinaw City Police Officer) and the Village of Mackinaw City, on Sampson's claims of false arrest, malicious prosecution, and municipal liability. We AFFIRM.

**I.**

According to Sampson, on March 13, 2013, his friend Darryl Duncan offered him $150 to drive them from Detroit to Mackinaw City that evening so that Duncan could collect some personal property. When Sampson agreed, he did not know that Duncan was bringing heroin with him, and he testified that had he known, he would not have agreed.

Upon arriving at a hotel in Mackinaw City at about 3:00 a.m., Duncan entered a room while Sampson waited in the car. Duncan returned 10 minutes later and had Sampson follow a car leaving the hotel. While Sampson was following, Officer Klave initiated a traffic stop and Sampson pulled over. Officer Klave accused Sampson of running a stop sign, which Sampson

denied.    Officer Klave arrested Duncan on an outstanding arrest warrant and, after placing

Duncan in the patrol car, asked Sampson for permission to search his car. Sampson consented.

When Officer Klave discovered two small baggies of heroin on the floor behind the

passenger's seat, Sampson denied that the heroin was his and claimed that he had not known that

there was any heroin in his car.   Duncan, on the other hand, claimed ownership of the heroin,

saying it was for his personal use.  Officer Klave nonetheless arrested both Duncan and Sampson

on two charges: possession with intent to deliver four grams of heroin in violation of M.C.L.

§ 333.7401(2)(a)(iv); and maintaining a drug vehicle in violation of M.C.L. § 333.7405(1)(d).

Officer Klave took both men to the county jail and impounded the car.  But this was not a chance

traffic stop; this was a hastily arranged sting operation, to orchestrate the traffic stop and the

arrests.

At about 9:30 p.m. on the prior evening, Detective Jon Supernault of a multi-

jurisdictional task force, contacted Officer Klave and told him that Duncan was suspected of

drug-trafficking, would be arriving in Mackinaw City that night to meet with a confidential

informant (CI), and would be in possession of drugs.  At about 3:15 a.m., Officer Klave spoke

with the CI, who told him that Duncan had heroin to sell and would be following him from the

hotel in a white Dodge Intrepid, accompanied by an unknown African-American male.  Officer

Klave instructed the CI to disregard a certain stop sign in the hope that Duncan would do

likewise and that Klave could execute a traffic stop without revealing the CI's involvement.

After arresting Duncan and Sampson at the traffic stop, Officer Klave prepared an

affidavit of probable cause for an arrest warrant, which included, in pertinent part:

> I was advised by CI that within the vehicle was a Darryl Duncan.  I was advised
> by CI that they would be going to a different location so that DUNCAN could sell
> CI heroin.  CI stated to me that there was heroin within the suspect vehicle.
>
> … I observed the suspect vehicle following CI West on Central Ave.  I noticed
> that the suspect vehicle … did not come to a complete stop at the intersection of

> Huron and Central Ave. I conducted a traffic stop on the above vehicle…. Upon contact with the driver who was identified as a DARYL LAMONT SAMPSON … I advised the reason for the traffic stop as running the stop sign….
>
> … I asked SAMPSON if I could search the vehicle and he stated that I could. Upon searching the vehicle I noticed Two small baggy type containers in the back seat of the vehicle believed to be heroin. Since the items were located within the vehicle the driver and owner of the vehicle … SAMPSON was also placed under arrest.… DUNCAN stated to me that the two baggy's located within the vehicle were his … that there was about 4 grams of heroin … for personal use.…
>
> Note: Suspects were never advised about CI information given, for CI's own protection.

R. 23-11 at 2 (sic throughout). The following day, March 15, 2003, the Cheboygan County prosecutor (relying on Officer Klave's affidavit as well as his own independent knowledge of the CI) authorized arrest warrants; a magistrate judge signed the arrest warrants; and the Michigan 89th District Court, Cheboygan County (the "state court"), arraigned Duncan and Sampson.

A month later, April 15, 2013, the state court conducted a "probable cause conference and preliminary examination," M.C.L. § 766.4, for Duncan and Sampson together, though they were represented separately, at which Officer Klave and the CI testified. The CI admitted on cross-examination that while he knew Duncan and that Duncan had drugs to sell, he did not know Sampson or that Sampson knew anything. In testifying about the stop, Officer Klave said:

> At that time I wanted to leave [the CI] completely out of this. I had a rolled stop. *Based on what [the CI] described to me, I had enough reason for a traffic stop, regardless.* But the initial stop was for a rolled traffic stop.

R. 23-8 at 38-39 (emphasis added).

> I approached the vehicle. I had a good idea that Mr. Duncan was within the vehicle before I even approached the vehicle. Once I approached the vehicle I observed Mr. Sampson behind the wheel of the vehicle.

R. 23-8 at 40.

> I looked over at Mr. Duncan. I asked him to provide some identification to--at that time I already knew who Mr. Duncan was. I was aware that we ha[d] a valid warrant for his arrest. I advised Mr. Duncan that we did have--in fact have a warrant and I asked him to exit the vehicle.

R. 23-8 at 41.  Officer Klave also testified about the arrests and his reasons for them.  The testimony fully described these events, and included facts not in the affidavit.

The state court found probable cause to bind Duncan over for trial on the charge of "possession with intent to deliver," but not on the charge of maintaining a drug vehicle, because Duncan did not own the car—Sampson did.  But the court dismissed both charges against Sampson and released him from custody, holding that the prosecutor had no proof that Sampson knew of Duncan's heroin.  In dismissing the drug-vehicle charge against Sampson, the court made no mention of the heroin found in the vehicle.  Nor did the court expressly consider or analyze the validity of the traffic stop.

Sampson filed this § 1983 action in federal district court, raising claims of false arrest and malicious prosecution against Officer Klave, and municipal liability against Mackinaw City under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978), for failure to train and failure to supervise.  Ultimately, the district court granted the defendants' motion for summary judgment.  *Sampson v. Village of Mackinaw City*, No. 15-cv-10704, 2016 WL 3125205 (E.D. Mich., June 3, 2016).  The court rejected Sampson's claim that the traffic stop had been illegal, explaining that "the information provided by a known CI on multiple occasions, Klave's corroborating observations, the location of the events, and the fact that all events occurred in the middle of the night together gave rise to at least reasonable suspicion that the vehicle's occupants were involved in a drug transaction."  *Id*. at *5.  Next, the court rejected Sampson's claim of false arrest, finding that Officer Klave was entitled to qualified immunity, regardless of the state court's "finding of no probable cause," *id*. at *6, "[b]ecause [Officer] Klave acted reasonably in believing that there was probable cause to arrest Sampson," specifically:

> In the context of a drug case, … an officer may reasonably infer a common enterprise between the driver of a vehicle and a passenger under certain circumstances. … [Here,] Klave knew that Sampson had driven Mr. Duncan for around five hours from Detroit in Sampson's car, knew the suspects did not arrive

4

until around 3:00 AM, knew Sampson had waited at the hotel for around ten minutes before following the CI in his vehicle, and ultimately discovered heroin in Sampson's vehicle … in a location accessible to Sampson…. This was bolstered by Detective Supernault's statement to Klave that Sampson was also somehow a subject of the SANE investigation. Whether that claim was ultimately proved true is irrelevant to the question of what Klave reasonably believed at the time of the arrest. Similarly, Defendant Klave was not required to believe Sampson's statement that the drugs did not belong to him. Finally, the fact that the judge ultimately determined that the arrest lacked probable cause does not change the fact that Klave's actions were not unreasonable in light of clearly established legal rules.

*Id*. at \*7 (citations and paragraph break omitted). The court granted qualified immunity to Officer Klave on the malicious prosecution claim as well, "because he did not make any false representations in his affidavit that were deliberate or in reckless disregard of the truth." *Id.* at \*9. The court granted summary judgment to Mackinaw City because Sampson "provided no evidence in support of his *Monell* claim"; specifically, Sampson presented no proof that the lack of formal performance evaluations was a deliberate custom or policy, no proof that Mackinaw City was deliberately indifferent to Sampson's constitutional rights, and no proof that any policy or indifference was the cause of Sampson's alleged injury. *Id*. at \*10. Finally, the court declined to exercise supplemental jurisdiction over Sampson's state law claims and dismissed them without prejudice. *Id*. In granting summary judgment to the defendants, the court denied Sampson summary judgment on these same claims for these same reasons.

## II.

We review the grant of summary judgment de novo, construing facts and inferences in the light most favorable to the non-moving party. *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Stryker Corp. v. Nat'l Union Fire Ins.*, 842 F.3d 422, 426 (6th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). But we

may affirm on any basis supported by the record. *Sanders v. Jones*, 845 F.3d 721, 731 (6th Cir. 2017) (citing *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002)).

Although Sampson's claims are not clearly articulated in his complaint, he accuses Officer Klave of three distinct federal constitutional violations: illegal vehicle stop, false arrest, and malicious prosecution. He also alleges corresponding state law violations and accuses Mackinaw City of various federal constitutional violations. We address each individually.

**A.**

Sampson argues vigorously that he did not run the stop sign, so there was no traffic violation and, therefore, Officer Klave cannot justify the traffic stop. This argument misses the point. The district court did not rely on the traffic violation and neither do we.

A traffic stop is a "seizure" and it must therefore conform to the requirements of the Fourth Amendment, but "to justify this type of seizure, officers need only 'reasonable suspicion'—that is, a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Heien v. North Carolina*, 574 U.S. --, 135 S. Ct. 530, 536 (2014) (quotation marks and citations omitted).[1] As the district court explained, *see Sampson*, 2016 WL 3125205 at *5, Officer Klave had reasonable suspicion of drug activity to prompt the traffic stop: Detective Supernault had forewarned Klave that Duncan was under task-force investigation for drug trafficking, would be traveling to Mackinaw City that evening to meet a known CI, and would have drugs to sell; the CI alerted Klave at 3:15 a.m. that Duncan had arrived, that Duncan and another man would be following the CI in a white Dodge Intrepid when they departed the hotel momentarily, and that Duncan had heroin; minutes later, Klave observed the two men in

---

[1] Moreover, reasonable suspicion can arise from reasonable mistakes. *Heien*, 135 S. Ct. at 536. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.' To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Id.* (quotation marks and citations omitted).

the white Dodge Intrepid following the CI, as predicted.  Officer Klave had reasonable suspicion of criminal activity to justify the initial traffic stop.[2]

**B.**

Sampson contends that his arrest was illegal—giving rise to a false-arrest claim—because Officer Klave did not have probable cause to justify the arrest, insisting specifically that: "Klave did not have one shred of evidence to believe that [Sampson] was responsible for any possession of narcotics," Apt. Br. at 19; and "the state district court judge determined that there was absolutely no probable cause for the arrest," Apt. Br. at 22.  But the record reflects that Officer Klave did have *some* reason to suspect Sampson, and the state court, based on sworn testimony in the preliminary examination, determined only that the prosecutor lacked sufficient proof that Sampson necessarily knew of Duncan's heroin to justify further prosecution. R. 23-8 at 66.

"To prevail on a false arrest claim brought under 42 U.S.C. § 1983, 'a plaintiff must prove that the arresting officer lacked probable cause to arrest the plaintiff.'"  *Id.* (quoting *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) (editorial mark omitted).

> An arrest … is constitutionally problematic only in the absence of probable cause. Probable cause to make an arrest exists if the facts and circumstances within the arresting officer's knowledge were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense.  We have defined probable cause as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.

*Hoover v. Walsh*, 682 F.3d 481, 499 (6th Cir. 2012) (quotation marks and citations omitted).

Sampson argues here—as he did in the district court—that Officer Klave is not entitled to summary judgment; rather, Sampson contends that *he* is entitled to summary judgment, "automatically," based on the state court's preliminary-examination finding that the evidence

---

[2] Duncan's outstanding warrant could also have justified the stop.  *See United States v. Shields*, 519 F.3d 836, 837 (8th Cir. 2008) ("The deputies were attempting to execute a valid arrest warrant …, which justified the stop of the truck."); *United States v. Cortez*, 449 U.S. 411, 417 n.2 (1981) ("Of course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct.").

was insufficient to bind him over for trial. *See* Apt. Br. at 18. But the record does not support

Sampson's argument that the state court determined that Officer Klave lacked probable cause to

arrest him. Rather, based on the record made in the preliminary examination, the state court held

merely that the county prosecutor lacked the evidence necessary to make out a *prima facie* case

against Sampson sufficient to bind him over for a trial. The state court was not asked to and

therefore did not reach the question of whether Officer Klave lacked probable cause at the time

of the arrest. In any event, we, like the district court, need not address the question of whether

Officer Klave had probable cause for the arrest because Sampson still cannot overcome Klave's

entitlement to qualified immunity. *See Sampson*, 2016 WL 3125205 at *6.

Qualified immunity shields government officials from standing trial for civil liability in

their performance of discretionary functions unless their actions violate clearly established rights.

*Mullenix v. Luna*, 577 U.S. --, 136 S. Ct. 305, 308 (2015). Otherwise stated, as pertinent here:

> [Q]ualified immunity shields [an arresting officer] from [a] suit for damages if a
> reasonable officer could have believed [the arrest] to be lawful, in light of clearly
> established law and the information the arresting officers possessed. Even law
> enforcement officials who reasonably but mistakenly conclude that probable
> cause is present are entitled to immunity. …
>
> ... [T]he court should ask whether the agents acted reasonably under settled law in
> the circumstances, not whether another reasonable, or more reasonable,
> interpretation of the events can be constructed [] after the fact.
>
> ...
>
> The qualified immunity standard gives ample room for mistaken judgments by
> protecting all but the plainly incompetent or those who knowingly violate the law.
> This accommodation for reasonable error exists because officials should not err
> always on the side of caution because they fear being sued.

*Hunter v. Bryant*, 502 U.S. 224, 227-29 (1991) (quotation marks and citations omitted). The

plaintiff in a § 1983 action bears the burden of overcoming the qualified immunity defense.

*Thompson v. City of Lebanon*, 831 F.3d 366, 369–70 (6th Cir. 2016). At the summary judgment

stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established. *Wood v. Moss*, 572 U.S. --, 134 S. Ct. 2056, 2067 (2014).

The term "clearly established" in this standard "does not require a case directly on point…, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. --, 137 S. Ct. 548, 551 (2017) (quotation marks, editorial mark, and citations omitted). That is, "'clearly established law' should not be defined at a high level of generality[,] [but rather] must be particularized to the facts of the case." *Id.* at 552 (quotation marks and citations omitted). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (quotation marks, editorial mark, and citations omitted).

Sampson offers *Ahlers v. Schebil*, 188 F.3d 365, 371-72 (6th Cir. 1999), which says "that officers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone," (emphasis omitted), and refers to "hasty, unsubstantiated arrest[s] [made] with impunity," arising from "incomplete, poorly conducted investigations." Sampson contends that Officer Klave ignored exculpatory evidence when conducting his probable-cause evaluation, specifically: (1) Klave did not have a personal established history with the CI; (2) the CI did not know Sampson; (3) Sampson denied any knowledge of the heroin; and (4) Duncan admitted full ownership of the heroin. This, according to Sampson, establishes that Officer Klave lacked probable cause for the arrest, that Klave's assertion of probable cause was unreasonable, and that this unreasonable assertion violated Sampson's clearly established rights, per *Ahlers*.

But we have repeatedly been warned away from applying just this type of precedent— "defined at a high level of generality" rather than "particularized to the facts of [our] case." *See White*, 137 S. Ct. at 551. Consider that, in *Ahlers*, 188 F.3d at 367-69, a county jail detainee

accused a corrections officer (CO) of sexually assaulting her, the investigating detective asserted probable cause to arrest the CO based on the detainee's accusation while ignoring readily-available exculpatory evidence, and after dismissal, the CO sued the detective for arresting him without probable cause. Despite the language we just quoted in the foregoing paragraph about ignoring exculpatory evidence, we actually determined that the victim's eye-witness statement alone provided "ample probable cause"; held that "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused"; explained that the officer "is under no obligation to give any credence to a suspect's story or alibi"; and added that "a plausible explanation" does not "in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Id.* at 371 (quotation marks, editorial mark, and citations omitted). Also, upon finding that the detective had probable cause, we passed on the question of qualified immunity, concluding that the "[d]efendants have no need for a qualified immunity defense." *Id.* at 374. Therefore, even if *Ahlers* were sufficiently on point with the present case—which it is not—its legal propositions actually counter, rather than aid, Sampson's argument.

In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Court opined that because "a car passenger … will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing," "it was reasonable for the officer [in *Pringle*] to infer a common enterprise." *Id.* at 373 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304-05 (1999)). Sampson argues that the facts here distinguish it from *Pringle*, which raises *Pringle*'s own distinction from *United States v. Di Re*, 332 U.S. 581 (1948).

In *Pringle*, 540 U.S. at 367-68, a police officer executed a traffic stop of a speeding car carrying three men, obtained consent to search the car, discovered five baggies of cocaine hidden in the back seat, and—when none of the men admitted ownership—arrested all three for cocaine

10

possession. Pringle, the front seat passenger, challenged the officer's assertion of probable cause. *Id.* at 370. Because "the three men failed to offer any information with respect to the ownership of the cocaine," however, the Court thought it "an entirely reasonable inference … that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine," such that "a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly." *Id.* at 372. The Court rejected "Pringle's attempt to characterize th[e] case as a guilt-by-association case," *id.*, and held that—lacking any other information concerning individualized ownership or non-ownership—it was "reasonable for the officer to infer a common enterprise" because car passengers "have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.* at 373 (quoting *Wyoming*, 526 U.S. at 304-305). The Court then turned to *Di Re*. *Id.* at 373-74.

In *Di Re*, 332 U.S. at 593, an informant alerted an investigator that he was about to buy counterfeit gasoline ration coupons from a man named Buttitta and the investigator arrived to find three men in a car: the informant in the rear seat, holding counterfeit coupons; Buttitta in the driver's seat; and Di Re in the front passenger's seat. The informant told the investigator that he got the coupons from Buttitta; he did not implicate Di Re in any way. *Id.* Nonetheless, the investigator arrested all three men. *Id.* Di Re argued that the investigator lacked probable cause for his arrest because the investigator had no reason, other than his mere presence in the car, to suspect him of having counterfeit coupons. The Court agreed. *Id.* at 592. Although recognizing the possibility of an "inference of participation in [a] conspiracy" under different facts, *id.* at 593, the Court held that "[a]ny inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person," *id.* at 594.

In distinguishing these two cases, the Court explained in *Pringle*, 540 U.S. at 373-74, that "[n]o such singling out occurred in [*Pringle*]; none of the three men provided information with

11

respect to the ownership of the cocaine or money." In our case, arguably, this *singling out did occur*: the CI identified Duncan but not Sampson, Sampson denied knowledge, and Duncan admitted possession. This does not mean, however, that Officer Klave's assertion of probable cause to arrest Sampson necessarily violated clearly established law as found in *Di Re*, because clearly established law is not defined at such "a high level of generality"; "it must be particularized to the facts of the case." *White*, 137 S. Ct. at 552. The fundamental question remains: Did Officer Klave have cause for a reasonable—even if mistaken—belief that Sampson had committed a crime based on the totality of the facts and circumstances within his knowledge? The record here establishes that he did.

Officer Klave had been forewarned that Duncan, a suspected drug-trafficker, was travelling to Mackinaw City that night to sell drugs to a CI; was alerted by the CI that Duncan actually had the drugs and was in Sampson's white Dodge Intrepid; and had personally identified Duncan in the car and arrested him on an outstanding warrant. Officer Klave knew that Sampson had driven Duncan the five-hour trip from Detroit, arriving at 3:00 a.m. without any specific destination other than the rendezvous with the CI, had waited in the car at least 10 minutes while Duncan entered the hotel and returned, and then followed the CI in his car. Officer Klave discovered a small amount of heroin (four grams) stashed behind the passenger seat of Sampson's car—a location also accessible to Sampson. While these facts establish that the purpose of this would-be 10-hour round trip was an illegal drug sale, they also support a reasonable suspicion that Sampson was the owner and driver of the vehicle in which the heroin was found.

While the CI had not recognized or incriminated Sampson when he saw him waiting in the car in the hotel parking lot (through the 3:00 a.m. darkness), the CI did alert Officer Klave to Sampson's presence as a putative accomplice. Also, while Duncan eventually claimed ownership

of the heroin, he had not done so immediately nor did he keep it in his personal possession; he had stashed it in the backseat of Sampson's car. And, while Sampson denied knowledge of the heroin, Klave was not required to believe him in light of the surrounding circumstances, such as the duration and purpose of the trip, that it was 3:00 a.m., and that Detective Supernault had told him that Sampson was, in some way, also a subject of the drug task force investigation.

Finally, Officer Klave arrested Sampson on a charge of possession with intent to deliver, but also a charge of maintaining a drug vehicle, which does not require personal possession. On this latter charge, "[a] person shall not … [k]nowingly keep or maintain a … vehicle… that is frequented by persons … for the purpose of using controlled substances or … for keeping or selling controlled substances." M.C.L. § 333.7405(1)(d). Sampson could violate this statute by having Duncan and the heroin in the car, even if the heroin remained in Duncan's possession at all times. A finding of probable cause for this charge would render harmless any insufficiency of evidence on the possession charge.

Even were we to accept that these facts and circumstances did not establish probable cause for Sampson's arrest, they nonetheless establish that Officer Klave's mistaken belief otherwise was not unreasonable under clearly established law. Consequently, Officer Klave is entitled to qualified immunity.

## C.

Sampson contends that his detention was illegal—and thus malicious prosecution—because Officer Klave did not have probable cause to recommend the charges to the prosecutor. *See* Apt. Br. at 24 ("there was clearly a lack of probable cause based on the fact that the charges against [Sampson] were dismissed at the preliminary examination hearing as there was no probable cause to bind [Sampson] over").

Because malicious prosecution is "entirely distinct" from false arrest, the claim invokes a different test with different elements. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). We have established a four-element test for a malicious-prosecution claim under § 1983, under which the plaintiff must prove the following:

> First, … that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute.
>
> Second, … that there was a lack of probable cause for the criminal prosecution.
>
> Third, … that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure.
>
> Fourth, [that] the criminal proceeding … [was] resolved in the plaintiff's favor.

*Sykes*, 625 F.3d at 308-09 (quotation marks, editorial marks, citations, and footnotes omitted; paragraph breaks added). Under the first element, an investigating officer does not escape liability just because someone else (e.g., the prosecutor) made the actual decision to prosecute, so long as the plaintiff can show that the officer "influenced or participated in the decision to prosecute." *Id*. at 311-12. But an officer's "participation must be marked by some kind of blameworthiness, something beyond mere negligence or innocent mistake." *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). And we have made "absolutely clear" our holding "that an officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's *truthful* materials." *Sykes*, 625 F.3d at 314 (emphasis in original). Such is the claim here.

Simply put, Officer Klave provided truthful information to the county prosecutor, who made the decision to authorize the arrest warrant and commence criminal proceedings. *See* R. 33-4 (prosecutor's affidavit). Sampson points to five items that Officer Klave omitted from his probable-cause affidavit, and argues that this omission is tantamount to active falsehood, misleading to the prosecutor. We disagree. First, Klave did not name the CI or provide

14

information about the CI's background, criminal history, or reliability; but the prosecutor was already familiar with the CI, *see* R. 33-4, and even called him to testify at the preliminary hearing, *see* R. 23-8.  Second, Klave did not explain that the CI had never met Sampson or mentioned Sampson to him; but the CI had accurately identified the car, Duncan, and the heroin —implicating Sampson was unnecessary.  Third, Klave did not reveal that the baggies were behind the *passenger* seat, stating only that they were "in the back seat"; but either way, the baggies were within Sampson's reach. Fourth, Klave did not relay that Sampson had denied ownership of the baggies, but that is unremarkable: a suspect in these circumstances would be expected to disclaim ownership, whereas it is noteworthy—as Klave did report—that Duncan admitted ownership.  Fifth, Klave asserted that the CI had told him "that there was heroin within the suspect vehicle," but the CI had actually told him only that Duncan had heroin on his person; but this inescapable inference is neither untrue nor misleading—Duncan had heroin on his person, his person was in the suspect vehicle, ergo heroin was in the suspect vehicle.  All told, none of these five omissions was material to the decision, or even necessarily exculpatory.

Moreover, Sampson has not persuaded us that these omissions, taken together, falsely implied his guilt and misled the prosecutor into the decision to pursue the criminal charges.  We find it likely that this omitted information was immaterial to the decision and its inclusion would not have changed the prosecutor's view in any meaningful way.  But even if we assume otherwise—that this information might have had some effect—and that Officer Klave *should have* included this information in his report to the prosecutor, we nonetheless must conclude that these particular omissions were, at most, merely mistaken or negligent, and do not rise to the level of "blameworthiness" necessary to establish Officer Klave's participation under the first element of the malicious prosecution standard.  *See Johnson*, 790 F.3d at 655.

Because Officer Klave is not responsible for commencing the criminal proceeding against Sampson, he is entitled to summary judgment on this malicious prosecution claim.

**D.**

Sampson contends that he has cognizable state law claims for false arrest and malicious prosecution based on the same facts and circumstances. *See* Apt. Br. at 24-26. But the district court declined to exercise supplemental jurisdiction over Sampson's state law claims.

We review for an abuse of discretion a district court's decision concerning the exercise of supplemental jurisdiction over state law claims. *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). The dismissal of the federal claims, however, generally creates a presumption in favor of dismissing, without prejudice, any remaining state-law claims. *Id.* at 1254-55 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

Because we affirm the district court's grant of summary judgment to Officer Klave on each of Sampson's federal-law claims, effectively dismissing them, we also affirm the court's decision to decline supplemental jurisdiction over the corresponding state-law claims.

**E.**

Sampson contends that Mackinaw City was deliberately indifferent in its failure to supervise its police officers because it does not conduct formal performance evaluations, and that such failure subjects Mackinaw City to liability pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). Apt. Br. at 28-29. But, as the district court found, Sampson pointed to no evidence that the lack of performance evaluations was a deliberately chosen custom, much less an official departmental policy, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); that a lack of performance evaluations led to Sampson's alleged constitutional injury, *see Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993);

or that the lack of performance evaluations meant that Mackinaw City was deliberately indifferent to his constitutional rights, *see City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Because Sampson lacked evidence to support his *Monell* claim, the district court was correct to award summary judgment to Mackinaw City on this claim.

## III.

For the foregoing reasons, we AFFIRM the judgment of the district court.