RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0242p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

**19-1191 & 19-1211**

EHSAN MOHAMAD OUZA,

> *Plaintiff-Appellee/Cross-Appellant*,

> *v.*

CITY OF DEARBORN HEIGHTS, MICHIGAN; JORDAN DOTTOR; GENE DERWICK,

> *Defendants-Appellants/Cross-Appellees*.

**19-1393**

EHSAN MOHAMAD OUZA,

> *Plaintiff-Appellant*,

> *v.*

CITY OF DEARBORN HEIGHTS, MICHIGAN; JORDAN DOTTOR,

> *Defendants-Appellees*.

Nos. 19-1191/1211/1393

---

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:16-cv-14331—Terrence George Berg, District Judge.

Argued: January 30, 2020

Decided and Filed: August 5, 2020

Before: MERRITT, CLAY, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jennifer A. Richards, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for City of Dearborn Heights, Michigan parties. Shawn C. Cabot,

CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Ehsan Ouza. **ON BRIEF:** Jennifer A. Richards, Jeffrey R. Clark, Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for City of Dearborn Heights, Michigan parties. Christopher J. Trainor, Amy J. DeRouin, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for Ehsan Ouza.

CLAY, J., delivered the opinion of the court in which MERRITT, J., joined. GRIFFIN, J. (pp. 29–41), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

CLAY, Circuit Judge. In this 42 U.S.C. § 1983 action arising from a domestic disturbance incident, the parties appeal and cross-appeal multiple rulings of the district court. In Case No. 19-1191, Defendant Officers Gene Derwick and Jordan Dottor interlocutorily appeal the district court's denial of their motion for summary judgment on qualified immunity grounds with regard to Plaintiff's excessive force claim. They also appeal the district court's ruling that they spoiled relevant evidence. In Case No. 19-1211, Plaintiff Ehsan Ouza appeals the district court's ruling that she cannot rely on evidence of her carpal tunnel diagnosis to demonstrate injury from Defendants' alleged excessive force, and she appeals the district court's failure to sanction Defendants for spoiling evidence by adopting an adverse inference against them. In Case No. 19-1393, Plaintiff appeals the district court's grant of summary judgment in favor of Defendant Dottor on qualified immunity grounds with regard to her false arrest claims and the district court's grant of summary judgment in favor of Defendant City of Dearborn Heights on her municipal liability claim. For the reasons that follow, we affirm in part and reverse in part the district court's order, and remand the case for further proceedings consistent with this opinion.

**BACKGROUND**

**A. Factual Background**

The factual circumstances underlying these three appeals arise from a domestic disturbance incident and the subsequent arrest of Plaintiff at her home in Dearborn Heights,

Michigan.  The following facts are stated in the light most favorable to Plaintiff, except where noted.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (when evaluating a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party).

### 1.  The First Incident

At approximately 8:00 a.m. on December 18, 2014, Plaintiff Ehsan Ouza was arguing with her adult son, Hassan.  Plaintiff and her daughter, Maysaa, were trying to prevent Hassan from leaving the house and driving because they believed he was under the influence of drugs.  Maysaa called her father, Mohamad, to ask him to help convince Hassan not to drive.  Mohamad is Plaintiff's ex-husband.  At the time, Plaintiff had a Personal Protection Order ("PPO") in effect against Mohamad because he had threatened her and physically abused her in the past.  Mohamad told Maysaa to let Hassan drive the car, but Maysaa threatened to call the police on her brother if he drove.  Mohamad then showed up at Plaintiff's house, in violation of the PPO, and took Maysaa's and Plaintiff's cell phones so that they could not call the police.  At some point after Mohamad arrived at the house, Hassan pushed a wardrobe on top of Plaintiff.

Because Mohamad had taken her cell phone, Maysaa went to a nearby gas station to call the police.  At 8:05 a.m., Defendant Officer Dottor was dispatched to the home in response to Maysaa's call.  Dispatch reported "30 YOM vs mother and sister, No weapons, Male has been drinking and taking pills, . . . Male has taken Xanax."  (First Case Rep., R. 26-4, Pg. ID 185.)  It also reported "Father and son vs mother and sister, Mother states son and father hit the mother. . . . Father took the son from the location."  (*Id.*)  When Officer Dottor arrived at the home approximately ten minutes later, Hassan and Mohamad were gone.

Officer Dottor interviewed Plaintiff and Maysaa about the incident.  According to the case report prepared by Officer Dottor, Plaintiff reported that Hassan had pushed a wardrobe on top of her, that she had fallen as a result and that the wardrobe had landed on her stomach.  Maysaa told Officer Dottor that Hassan had pulled her hair and was screaming at her.  Maysaa reported that at some point during the argument, Mohamad had arrived "and took Hassan away from the residence."  (*Id.* at Pg. ID 183.)  Plaintiff and Maysaa told Officer Dottor that they were

willing to prosecute, and Officer Dottor gave them a crime victim's rights card.  On the case report for this first incident, Plaintiff was identified as the "victim" of domestic violence.  (*Id.* at Pg. ID 182.)  After giving her a victim's rights card, Defendant Dottor left Plaintiff's house.

### 2.  The Second Incident

Soon after Officer Dottor left the house, Mohamad returned with Plaintiff's and Maysaa's cell phones.  Mohamad pushed aggressively on the front door and was yelling and cursing.  The women did not want Mohamad to come in, and Plaintiff begged Maysaa not to open the door. Maysaa cracked the door open only slightly in order to retrieve their cell phones.  Mohamad then pushed his way into the house, causing Plaintiff to fall onto her back. Mohamad then got on top of Plaintiff, and refused to get off of her.  Plaintiff grabbed a broken hanger that was on the floor nearby (presumably as a result of Hassan pushing the wardrobe over earlier) and "tapped" Mohamad's shoulder with it and bit him in order to get him off of her.  (Maysaa Dep., R. 29-3, Pg. ID 342.)  Maysaa then began pushing Mohamad and jumped on his back to try to get him off of Plaintiff, yelling, "Get out, get out, you're trespassing, get out, get out, don't touch my mother, get out." (*Id.* at Pg. ID 343.)  Eventually, Maysaa was able to push Mohamad out of the house.  At some point, she called 911 and reported that her father was hitting her mother.

At 9:55 a.m., Officer Dottor and Officer Derwick were dispatched to the house in response to Maysaa's second call.  When Defendants arrived, Mohamad was standing outside of the house and he proceeded to tell Officer Dottor a false story.  He said that he had stayed at the house from the time that Officer Dottor first investigated the prior incident involving Hassan until the present.  Mohamad also told Dottor that Plaintiff had become upset and attacked him while he was walking out of the home and attempting to leave.  Plaintiff and Maysaa disputed Mohamad's story.  Plaintiff told Officer Dottor that Mohamad had forced his way into the house and attacked her, and that she had attempted to bite him and tap him with the hanger in self-defense.  Plaintiff was visibly upset and crying hysterically.  According to Plaintiff, Mohamad did not have any visible injuries.  According to Defendants, Officer Dottor observed a small cut on the left side of Mohamad's face, which he believed to be from the hanger, and a bite mark on Mohamad's left arm.

Officer Dottor then placed Plaintiff under arrest for domestic assault and handcuffed her. As Defendants were escorting Plaintiff to their police car, Mohamad said, "What are you guys doing? I was trespassing. I hit her. Take me instead. She was just defending herself. What are you doing?" (*Id.* at Pg. ID 346; *see also id.* at Pg. ID 347 ("What are you doing? I trespassed. I assaulted her. She was defending herself. Please take me.").) Nevertheless, Defendants proceeded with the arrest.

Plaintiff alleges that while walking to the police car she told Defendant Dottor at least three times that the handcuffs were too tight and that her wrists were red and causing her pain. Dottor ignored her complaints. Officer Derwick transported Ehsan to the police department. While in transit, Plaintiff continued to complain about the handcuffs. Plaintiff was then booked into the Dearborn Heights Police Department Jail. She was released from custody the next day, and the prosecutor declined to prosecute.

### 3. Medical Treatment

Plaintiff alleges that she suffered and continues to suffer physical injury as a result of the excessively tight handcuffing. She says that the handcuffing caused pain and red marks on her arms. These marks were still present the day after her arrest, and Plaintiff provided pictures showing the marks in the district court. She also alleges that the excessively tight handcuffing caused her to experience carpal tunnel syndrome, numbness, and tingling.

On January 19, 2015, approximately one month after her arrest, Plaintiff had x-rays taken of her wrists because she was experiencing bilateral wrist pain. Her treating physicians interpreted the x-rays as showing "[n]o evidence of fracture, erosive change, or significant degenerative change in either the right or left wrist." (Combined Medical Records, R. 26-13, Pg. ID 257.) Nevertheless, Plaintiff was still feeling symptoms of carpal tunnel, numbness, and tingling a few weeks later. On February 11, 2015, she sought hand treatment from Dr. Edward Haas who diagnosed her with (a) bilateral carpal tunnel syndrome with left worse than right, and (b) left lateral epicondylitis (tennis elbow).[1] (Haas Medical Records, R. 29-14, Pg. ID 435–37.)

---

[1]"Carpal tunnel syndrome is a condition produced by compression of the median nerve as it travels through the carpal tunnel at the wrist, resulting in symptoms of tingling, pain, and weakness in the wrist and in the thumb

Dr. Haas recommended Plaintiff for occupational therapy and requested that she come back in a few weeks to evaluate whether she required a steroid injection.

On March 24, 2015, Plaintiff received a left carpal tunnel steroid injection from Dr. Haas, but this did not help alleviate her pain, and, in fact, may have caused it to worsen. Over the subsequent months and years, Plaintiff continued to seek treatment from Dr. Haas and undergo painful hand therapy, which has not alleviated her pain. According to Plaintiff, "[t]o this day, [her] wrists and hands continue to cause her pain when she does any kind of activity with her hands for more than a few minutes." (Second Br. at 13 (citing Ehsan Dep., R. 29-2, Pg. ID 334).)

## B. Procedural History

Plaintiff sued Defendants pursuant to 42 U.S.C. § 1983, claiming that their actions violated her constitutional rights. She brought an excessive force claim against both Defendants Dottor and Derwick based on unreasonably tight handcuffing, in violation of the Fourth Amendment. She also sued Defendant Dottor for arresting her without probable cause, in violation of the Fourth Amendment. Lastly, she sued Defendant City of Dearborn Heights for failure to train and supervise its police officers under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).[2]

Following limited discovery, Defendants moved for summary judgment on each of Plaintiff's claims. Defendants Dottor and Derwick asserted that they were entitled to summary judgment based on qualified immunity. The City of Dearborn Heights argued that it was entitled to summary judgment because Plaintiff had failed to demonstrate a genuine factual dispute as to its failure to train or supervise its police officers.

---

and first three digits of the hand." 8 Am. Jur. Proof of Facts 3d § 1 (1990). Stedmans Medical Dictionary defines tennis elbow as "chronic inflammation at the origin of the extensor muscles of the forearm from the lateral epicondyle of the humerus, as a result of unusual or repetitive strain." *Tennis Elbow*, Stedmans Medical Dictionary 282180 (2014).

[2]Plaintiff also brought an illegal search claim against Defendant Dottor based on his entry into her home, which the district court dismissed because Plaintiff consented to the entry. *See Ouza v. City of Dearborn Heights*, No. 16-14331, 2019 WL 339616, at *7 (E.D. Mich. Jan. 28, 2019). Plaintiff does not challenge that ruling on appeal.

In her response to Defendants' motion for summary judgment, Plaintiff raised a spoliation claim. She argued that at the time of her arrest, Defendants Dottor and Derwick were outfitted with fully functioning body microphones and that their vehicles were outfitted with both audio and video equipment. She also claimed that Defendants summoned an evidence technician, Officer Popp, to the scene of her arrest, and he took pictures of Mohamad's alleged injuries. Nevertheless, Defendants failed to provide this evidence to Plaintiff in response to her discovery requests and they did not explain why the evidence was missing.

The district court granted in part and denied in part Defendants' motion for summary judgment. The court first held that Defendants Dottor and Derwick had spoiled relevant evidence, but it declined to adopt an adverse inference against them for purposes of ruling on their motion. The district court then held that Defendant Dottor was entitled to qualified immunity from suit on Plaintiff's false arrest claim. It found that Plaintiff had demonstrated a triable issue as to whether or not probable cause existed for her arrest, as the Fourth Amendment requires, but found that her right was not clearly established at the time of the arrest. However, the district court denied qualified immunity to Officers Dottor and Derwick on Plaintiff's excessive force claim based on tight handcuffing. It found that Plaintiff's right to be free from unreasonably tight handcuffing was clearly established at the time of her arrest, and that Plaintiff had demonstrated a genuine factual dispute as to whether she suffered some physical injury from the handcuffing based on the red marks on her wrists that were visible the next day. The district court refused to consider evidence of Plaintiff's carpal tunnel syndrome diagnosis in ruling on Defendants' motion, however, because it found that Plaintiff had not shown that the tight handcuffing caused her carpal tunnel syndrome. Lastly, the district court granted summary judgment in favor of Defendant City of Dearborn Heights on Plaintiff's *Monell* claim.

The parties now appeal and cross-appeal the district court's order.[3]

---

[3]"A grant of partial summary judgment that does not dispose of all parties and all claims is generally not immediately appealable unless the district court issues a Fed. R. Civ. P. 54(b) certificate." *Bonner v. Perry*, 564 F.3d 424, 427 (6th Cir. 2009). In the present case, the district court issued a Rule 54(b) certificate as to its grant of summary judgment in favor of Officer Dottor on Plaintiff's false arrest claim and its grant of summary judgment in favor of the City of Dearborn Heights on Plaintiff's *Monell* claim. *See Ouza v. City of Dearborn Heights*, No. 16-14331, 2019 WL 1455241, at *3 (E.D. Mich. Apr. 2, 2019). Therefore, those claims are properly before us.

**DISCUSSION**

**A. Excessive Force**

In Case No. 19-1191, Defendants Dottor and Derwick appeal the district court's order denying them qualified immunity from suit on Plaintiff's excessive force claim based on tight handcuffing. They argue that this Court should follow in the district court's footsteps in refusing to consider Plaintiff's evidence of her carpal tunnel syndrome when ruling on their motion, and instead ask us to determine only whether Plaintiff's allegations of red marks alone could ever be sufficient to make out an excessive force claim as a matter of law. They say that we lack jurisdiction to consider Plaintiff's evidence of her carpal tunnel syndrome in ruling on their motion. In Case No. 19-1211, Plaintiff cross-appeals the district court's ruling on her excessive force claim. She says that we have jurisdiction to consider whether the district court improperly weighed the evidence and applied the wrong standard at the summary judgment stage by failing to consider her evidence of carpal tunnel syndrome. She argues that we should consider both her allegations of red marks and her carpal tunnel syndrome diagnosis in deciding whether Defendants are entitled to qualified immunity. For the reasons that follow, we agree with Plaintiff.

**1. Standard of Review**

This Court reviews *de novo* a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds. *Rafferty v. Trumbull County*, 915 F.3d 1087, 1093 (6th Cir. 2019). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We have discretion to choose which prong of the qualified immunity inquiry to consider first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). If we find that the plaintiff's right was not clearly established at the time of the defendant's conduct, we do not need to go on to decide whether the alleged conduct was in fact unconstitutional. *See Pearson*, 555 U.S. at 236. However, we may choose to do so. *Id.*

A right is clearly established for purposes of overcoming the qualified immunity defense only when "existing precedent [has] placed the statutory or constitutional question beyond debate," although we do not require "a case directly on point." *al-Kidd*, 563 U.S. at 741; *accord White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam). Thus, an official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)). In this way, the defense "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. The "salient question" in determining if a defendant is entitled to qualified immunity is whether she had "fair warning" that her conduct was unconstitutional. *See Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

### 2. Jurisdiction

Defendants' primary defense on this claim is jurisdictional: they argue that we lack jurisdiction to consider Plaintiff's allegations of carpal tunnel syndrome (including numbness and tingling) when determining if they are entitled to qualified immunity from suit on her excessively tight handcuffing claim. And indeed, it appears that Defendants' entitlement to qualified immunity rises and falls with their jurisdictional argument. This is because if we are able to consider Plaintiff's evidence of both red marks and carpel tunnel syndrome, then she has plainly demonstrated a violation of her clearly established rights for purposes of overcoming Defendants' summary judgment motion. *See, e.g.*, *Baynes v. Cleland*, 799 F.3d 600, 609 (6th Cir. 2015) (holding that allegations of periodic numbness are sufficient to create a genuine factual dispute as to physical injury from excessively tight handcuffing); *Morrison v. Bd. of Tr. of Green Tp.*, 583 F.3d 394, 402–03 (6th Cir. 2009) (denying qualified immunity on an excessively tight handcuffing claim where the plaintiff alleged bruising, wrist marks, and attendant pain); *Grooms v. Dockter*, 1996 WL 26917, 76 F.3d 378, at *1 (6th Cir. 1996)

(per curiam) (table) (denying qualified immunity where the plaintiff alleged carpal tunnel syndrome resulted from the excessively tight handcuffing).

However, that question becomes more difficult if we cannot consider Plaintiff's allegations of carpal tunnel syndrome and instead must consider only Plaintiff's allegations of red marks on her wrists. *Compare al-Lamadani v. Lang*, 624 F. App'x 405, 413 (6th Cir. 2015) (denying qualified immunity where the plaintiff alleged "that the cuffs left a red mark on his left wrist that turned blue and was gone the next day"), *with Smith v. Athens County*, 79 F. App'x 841, 843–44 (6th Cir. 2003) (order) (granting qualified immunity to the defendant on the plaintiff's excessively tight handcuffing claim because the plaintiff alleged only "elevated pulse and blood pressure, and red marks around his wrists"). With that context established, we turn to the merits of Defendants' jurisdictional argument.

This Court has jurisdiction to review "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). That is, on an interlocutory appeal from the denial of qualified immunity, we have jurisdiction to review only the "purely legal" question of "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Id.* at 528 and n.9. The flipside of this rule is that we do not have jurisdiction to review a district court's determination of "'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial" on an interlocutory appeal from a denial of qualified immunity. *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018) (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)); *accord, e.g.*, *Plumhoff*, 572 U.S. at 771–73; *see also Mitchell*, 472 U.S. at 528 ("An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim.").

We have consistently enforced *Johnson*'s jurisdictional bar in cases in which the defendant's qualified immunity appeal is based solely on his or her disagreement with the plaintiff's facts. *See, e.g.*, *Adams v. Blount County*, 946 F.3d 940, 951 (6th Cir. 2020); *McGrew v. Duncan*, 937 F.3d 664, 669–70 (6th Cir. 2019); *Barry v. O'Grady*, 895 F.3d 440, 445 (6th Cir. 2018); *see also Bunkley*, 902 F.3d at 559–60 (collecting Supreme Court cases). And we have

repeatedly explained that "to bring an interlocutory appeal of a qualified immunity ruling, the defendant must be willing to concede the plaintiff's version of the facts for purposes of the appeal." *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010).

Nevertheless, Defendants attempt to turn the *Johnson* rule on its head in the present case by arguing that we are bound by the district court's findings of fact even where the district court improperly construed those facts against Plaintiff, the non-moving party. Defendants ask us to decide the purely legal question of whether red marks alone—without allegations of swelling, bruising, or numbness—can ever be enough to make out a viable excessive force claim based on tight handcuffing under the Fourth Amendment. But we do not need to decide whether red marks alone are sufficient to make out an excessive force claim under the Fourth Amendment because Plaintiff's version of the facts includes more than red marks: she demonstrated red marks *and* carpal tunnel syndrome (including numbness and tingling) resulting from the tight handcuffing. To the extent that the district court failed to take those facts into account or construed them in Defendant's favor, it applied the wrong standard at the summary judgment stage.[4] *See, e.g.*, *Matsushita*, 475 U.S. at 587; *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009).

At bottom, Defendants' argument mischaracterizes the district court's ruling and misunderstands the *Johnson* rule. While this Court does not have jurisdiction to consider determinations of evidence sufficiency under *Johnson* (i.e., whether or not the plaintiff's allegations set forth a genuine issue for trial), we do have jurisdiction to review whether the district court properly adopted the plaintiff's version of the facts in assessing qualified immunity (i.e., whether it applied the correct summary judgment standard). Indeed, the precise scope of our appellate jurisdiction on interlocutory appeal from a denial of qualified immunity is whether

---

[4]The district court ruled that Plaintiff had not demonstrated "any causal link between the handcuffing and the later diagnosis of carpel tunnel syndrome" because Defendants had shown that Plaintiff sought treatment for hand numbness due to a neck injury from a car accident two months before the tight handcuffing. *Ouza*, 2019 WL 339616, at *8. The district court found that the prior treatment "does not necessarily preclude the conclusion that the handcuffs exacerbated a preexisting feeling of numbness and tingling," but nevertheless refused to consider Plaintiff's evidence of carpal tunnel syndrome as creating a genuine dispute of fact as to physical injury resulting from the tight handcuffing. *Id.* Such weighing of evidence was improper at the summary judgment stage. *See, e.g.*, *Biegas*, 573 F.3d at 374 ("In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.").

"the plaintiff's version of facts demonstrates a violation of clearly established rights." *Vakilian v. Shaw*, 335 F.3d 509, 515 (6th Cir. 2003); *see also Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014) ("Thus, a court of appeals would appear to have jurisdiction over so related a question as whether the district court properly adopted the plaintiff's version of the facts for purposes of ruling on the issue of qualified immunity.").

In the present case, Plaintiff's version of the facts includes evidence of red marks and carpal tunnel syndrome. We have jurisdiction to review whether that version of the facts sets forth a violation of a clearly established right.[5] *Mitchell*, 472 U.S. at 528–30.

### 3. Qualified Immunity

With our jurisdiction secure, we next consider whether Defendants Dottor and Derwick are entitled to qualified immunity from suit on Plaintiff's excessively tight handcuffing claim. We hold that they are not.

Regarding the clearly established prong, we have repeatedly recognized—and Defendants do not contest—that "freedom from excessively forceful or unduly tight handcuffing is a clearly established right for purposes of qualified immunity." *Baynes*, 799 F.3d at 613; *accord, e.g.*, *Marvin v. City of Taylor*, 509 F.3d 234, 247 (6th Cir. 2007) ("[T]he right not to be handcuffed in an objectively unreasonable manner was clearly established."); *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001) ("This circuit has held that the right to be free from excessive force, including 'excessively forceful handcuffing,' is a clearly established right for purposes of the qualified immunity analysis.").

Instead, Plaintiff's handcuffing claim turns on whether Defendants' conduct was unconstitutional. In order to demonstrate a genuine factual dispute as to excessively tight handcuffing, Plaintiff must put on some evidence that (1) she complained the handcuffs were too tight, (2) the defendant officers ignored her complaints, and (3) she experienced "some physical

---

[5]Of course, "in determining the relevant set of facts for purposes of deciding an interlocutory appeal, we do not ourselves make any findings of fact or inferences for purposes of subsequent proceedings." *Bunkley*, 902 F.3d at 561 (citing *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 611 (6th Cir. 2015)). Instead, "[w]hether [the plaintiff] is ultimately able to prove the alleged factual bases for his claims is a matter left for the finder of fact—not the appellate court on interlocutory appeal." *Nelson v. Shuffman*, 603 F.3d 439, 448 (8th Cir. 2010).

injury" resulting from the handcuffing. *Morrison*, 583 F.3d at 401 (citing *Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005)). The parties in this case dispute only the third element.

Plaintiff alleges two injuries, including subjective complaints of pain, resulting from the unreasonable handcuffing. First, she says that the handcuffing resulted in red marks on her wrists that were visible the day after her arrest (as documented in pictures). Second, she alleges that she suffered carpal tunnel syndrome as a result of the tight handcuffing, and has continued to undergo painful hand treatment from Dr. Edward Haas for the past five years (as documented in medical records). Defendants dispute this latter injury. They point out that Plaintiff suffered from hand numbness and tingling even prior to her arrest due to a neck injury from a car accident. But as the district court acknowledged, Plaintiff's prior injury "does not necessarily preclude the conclusion that the handcuffs exacerbated a preexisting feeling of numbness and tingling." *Ouza*, 2019 WL 339616, at *8. Instead, construing the evidence in the light most favorable to Plaintiff and drawing all inferences in her favor, she has demonstrated a genuine factual dispute as to whether the tight handcuffing resulted in "some physical injury," including red marks on her wrist and exacerbated symptoms of carpal tunnel syndrome. *Morrison*, 583 F.3d at 401; *see, e.g.*, *Baynes*, 799 F.3d at 609 (denying qualified immunity where the plaintiff alleged periodic numbness as a result of the excessively tight handcuffing); *al-Lamadani*, 624 F. App'x at 413 (denying qualified immunity where the plaintiff alleged "that the cuffs left a red mark on his left wrist that turned blue and was gone the next day"); *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 519 (6th Cir. 2016) ("The extent of the physical injury suffered by the plaintiff need not be severe in order to sustain the excessive-force [handcuffing] claim.").

Because Plaintiff's evidence of injury—including red marks on her wrists and her carpal tunnel syndrome—would permit a reasonable juror to find that Defendants violated her clearly established Fourth Amendment right to be free from excessively tight handcuffing, Defendants are not entitled to qualified immunity from suit on Plaintiff's excessive force claim.

**B. False Arrest**

Defendant Dottor is also not entitled to qualified immunity from suit on Plaintiff's § 1983 false arrest claim. (Plaintiff did not bring a false arrest claim against Derwick.) "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *accord, e.g.*, *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152. "Generally, probable cause exists when the police have 'reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (alteration in original) (quoting *Beck*, 379 U.S. at 91). Moreover, an officer is required to "consider the totality of the circumstances," and cannot look only at the evidence of guilt while ignoring all exculpatory evidence when assessing probable cause. *Id.* at 318. "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Id.* at 315 (quoting *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)).

**1. Clearly Established Right**

As discussed above, a right is clearly established for purposes of overcoming the qualified immunity defense when existing precedent has "placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Thus, Officer Dottor cannot be said to have violated Plaintiff's clearly established right to be free from arrest unsupported by probable cause "unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it." *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff*, 572 U.S. at 778–79).

To be sure, at the time of Officer's Dottor's conduct, it was "clearly established that arrest without probable cause violates the Fourth Amendment." *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (quoting *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)); *see, e.g.*, *Beck*, 379 U.S. at 91. But the Supreme Court has continually cautioned courts not to define a

constitutional right "at a high level of generality" when performing the qualified immunity analysis, such as the "right to be free of excessive force." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019); *accord District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Nevertheless, we have also recognized that "just as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly . . . it defeats the purpose of § 1983 to define the right too narrowly." *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012); *accord Jones v. Clark Cty.*, 959 F.3d 748, 766 (6th Cir. 2020). In the present case, we are guided by the Supreme Court's opinion in *Wesby*, which was also a false arrest case.

In *Wesby*, the Supreme Court emphasized the "imprecise nature" of probable cause determinations, 138 S. Ct. at 590, given that "[p]robable cause 'turn[s] on the assessment of probabilities in particular factual contexts' and cannot be 'reduced to a neat set of legal rules,'" *id.* (second alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Accordingly, the Court "stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment'" when determining if a defendant is entitled to qualified immunity. *Id.* (alteration in original) (quoting *White*, 137 S. Ct. at 552). And the Court said that "'a body of relevant case law' is usually necessary to 'clearly establish the answer' with respect to probable cause." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

Applying those principles to the case at hand, the Supreme Court began it analysis "by defining 'the circumstances with which [the officers] w[ere] confronted.'" *Id.* (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). It then considered whether there was controlling case law "finding a Fourth Amendment violation 'under similar circumstances.'" *Id.* at 591. Concluding that there was not, the Court held that the officers were entitled to qualified immunity. *Id.* We implement the same framework here.

We first consider the circumstances with which Officer Dottor was confronted. Officer Dottor had already investigated a prior domestic disturbance at Plaintiff's residence earlier that morning, in which Plaintiff was assaulted by her son and Officer Dottor informed her of her rights as a victim. According to Officer Dottor's first case report, the Police Dispatch had

reported: "Father and son vs mother and sister, Mother states *son and father hit the mother* . . . Father took the son from the location." (First Case Rep., R. 26-4, Pg. ID 185 (emphasis added).) When Officer Dottor arrived at the home approximately ten minutes later, Hassan and Mohamad were gone. Officer Dottor secured the scene and did not discover Mohamad or Hassan at the residence.

Soon after Officer Dottor left the house, Mohamad returned. Maysaa then called the police a second time and reported "*My dad is hitting my mom*, please come fast." (Maysaa Dep., R. 29-3, Pg. ID 345 (emphasis added).) Officer Dottor was dispatched to the house for the second time in response to Maysaa's call. When Officer Dottor arrived at Plaintiff's house, Mohamad was standing outside. Mohamad then told Officer Dottor his account of the events, which had several gaps and was unreliable on its face.

To begin, he told Officer Dottor that he had stayed at Plaintiff's house in order to gather clothes from the time that Officer Dottor first investigated the incident involving Hassan until the present. But Officer Dottor's report from the first investigation states that Mohamad had come by Plaintiff's house prior to Officer Dottor's arrival and then "took Hassan away from the residence." (First Case Rep., R. 26-4, Pg. ID 183; *see also id.* at Pg. ID 185 ("Father took the son from the location.").) Officer Dottor secured the scene and did not find Hassan or Mohamad. Therefore, Officer Dottor's firsthand knowledge contradicted Mohamad's account that he had stayed at the house following the incident with Hassan.

Mohamad then told Officer Dottor that Plaintiff had attacked him when he was trying to leave the home. According to Officer Dottor, Mohamad said that Ehsan "came up behind him and hit him in the left side of his face with a plastic hanger" and bit him. (Second Case Rep., R. 26-5, Pg. ID 190.) But this was doubtful in light of Maysaa's phone call to the police in which she reported that *her father* was hitting her mother. It was also dubious in light of the fact that the first case report stated that Hassan and Mohamad had hit Plaintiff, Officer Dottor correctly identified Plaintiff as the victim of domestic assault in his first investigation, and both incidents occurred at Plaintiff's house where Mohamad was trespassing.

Moreover, after hearing Mohamad's shaky account of the events, Officer Dottor entered the house where both Plaintiff and Maysaa informed him that Mohamad was trespassing and that he was the aggressor. Plaintiff alleges that she consistently tried to explain to Officer Dottor that she was the victim and acting in self-defense, but Officer Dottor ignored her. While an officer "is under no obligation to give any credence to a suspect's story," *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988), Maysaa also told Officer Dottor that Mohamad was the aggressor and that her mother was acting in self-defense. This was corroborated by Maysaa's phone call to the police in which she said that her father was assaulting her mother. Nevertheless, Officer Dottor arrested Plaintiff for domestic assault. As Officer Dottor was escorting Plaintiff to his police car, Mohamad said, "What are you guys doing? I was trespassing. I hit her. Take me instead. She was just defending herself. What are you doing?" (Maysaa Dep., R. 29-3, Pg. ID 346.) Ignoring Plaintiff's, Mohamad's, and Maysaa's pleas, Officer Dottor proceeded with the arrest. Plaintiff was held in custody overnight, and she was released the next day when the prosecutor declined to prosecute.

We next consider the relevant case law. *See Wesby*, 138 S. Ct. at 591. As noted above, it was certainly clearly established at the time of Plaintiff's arrest in 2014 that "absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may not arrest an individual." *Logsdon v. Hains*, 492 F.3d 334, 343 (6th Cir. 2007) (quoting *Gardenhire*, 205 F.3d at 313). In *Logsdon*, this Court held that this standard alone, absent any "sea change in this body of law since [the plaintiff's] arrest," was sufficient to overcome the defendant's qualified immunity defense. *See id.* at 343–44. Nevertheless, the district court in this case chose to define the right more narrowly. It considered whether Plaintiff had a clearly established right to be free "from the type of arrest Plaintiff experienced: arrest based on the testimony of one eyewitness who has an apparent bias in the matter." *Ouza*, 2019 WL 339616, at *6. And our case law establishes that she did under these circumstances.

In a series of cases, we have refined the governing standard for when an eyewitness' allegations are sufficient to establish probable cause. Beginning with *Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999), we explained that "[a]n eyewitness identification will constitute sufficient probable cause 'unless, at the time of the arrest, there is an apparent reason for the officer to

believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation.'" *Id.* at 370 (quoting *Rainer v. Lis*, No. 92–2436, 1994 WL 33969, at *2 (6th Cir. 1994)). In *Ahlers*, we held that an accuser's allegations of sexual assault were sufficient to create probable cause to arrest the accused because the accuser "was interviewed on three separate occasions . . . and each time her story remained consistent" and her allegations were "bolstered by Sheriff's Department's records which confirm that there was a window of time within which the alleged sexual assault could have occurred." *Id.* at 367, 370–71. Because the accused did not allege any facts from which a reasonable person could conclude that the accuser's testimony was untruthful, the defendant had probable cause to arrest the accused. *Id.* at 371.

Stated in positive terms, *Ahlers* established that a person has a right to be free from arrest based solely on an eyewitness account that is in some way untruthful or unreliable. *See id.* at 370–71; *see also Wesley v. Campbell*, 779 F.3d 421, 435 (6th Cir. 2015) ("It is well-settled that evidence contradicting even part of a witness's allegations seriously undermines their reliability and can defeat probable cause.").[6] Similarly in *Gardenhire v. Schubert*, 205 F.3d at 317, we held that an allegation by one individual that another person committed a crime without further corroboration is insufficient to establish probable cause to arrest that person. At most, it gives an officer reasonable suspicion of criminal activity such that the officer would be justified in investigating further pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). *Gardenhire*, 205 F.3d at 317. But the witness' allegation standing alone does not give an officer probable cause to arrest the suspect. *Id.* These cases and their progeny clearly establish that Plaintiff had a right to be free from arrest based solely on Mohamad's unreliable and uncorroborated accusation. This is especially true where Mohamad's account was the only piece of evidence from which Officer Dottor could even conceivably (although unreasonably) have concluded that he had probable cause to arrest Plaintiff.

---

[6]This is our only citation to *Wesley v. Campbell*, and we do not cite to or otherwise rely on *Courtright v. City of Battle Creek*, 839 F.3d 513 (6th Cir. 2016), in resolving Plaintiff's false arrest claim. Therefore, we must strongly reject the dissent's suggestion that we are somehow improperly relying on these cases, which were decided after Plaintiff's false arrest in 2014, in order to determine Defendant's entitlement to qualified immunity. The supporting citation to *Wesley* here is simply to show that later panels of this Court have also interpreted our earlier case law as clearly establishing that an uncorroborated and unreliable eyewitness accusation alone does not create probable cause.

Our conclusion that Officer Dottor had "fair warning" that his conduct would be unlawful is further supported by our precedent establishing that an officer must consider both inculpatory and exculpatory evidence when assessing probable cause. *See Guertin*, 912 F.3d at 932 ("Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was unconstitutional." (quoting *Hope*, 536 U.S. at 741)). In *Gardenhire* we explained that "[a] police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime. . . . [I]n obtaining such reliable information, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence, before determining if he has probable cause to make an arrest." 205 F.3d at 318.

In *Logsdon v. Hains*, this Court applied that holding to facts materially similar to the present case. The plaintiff in *Logsdon* was protesting outside of an abortion clinic in Ohio. 492 F.3d at 337–38. At some point while protesting, the plaintiff walked onto the clinic's property when confronting the clinic's president and then "promptly return[ed] to the public sidewalk." *Id.* at 338. The president called the police and reported that the plaintiff was trespassing. *Id.* The defendant officers arrested the plaintiff for trespass and disorderly conduct based on the single eyewitness allegation, and "refused to listen to a witness's account of the incident, admonishing her to 'Tell it to the judge.'" *Id.*

This Court reversed the district court's grant of qualified immunity to the officers, finding that they unreasonably "turn[ed] a blind eye" to potentially exculpatory evidence when they refused to listen to the witness' "attempted explanation" of the incident. *Id.* at 342 (alteration in original) (quoting *Ahlers*, 188 F.3d at 372). We stated that the officer's consideration of the totality of the circumstances "should have encompassed readily available eyewitness accounts, but did not because Defendants refused to listen." *Id.* at 343. "Even assuming that [the witness] constitutes a 'reliable source' here, Defendants deliberately disregarded available evidence and, consequently, failed to reasonably formulate probable cause." *Id.* The same can be said here with regard to Officer Dottor's refusal to consider Maysaa's and Plaintiff's explanation of the events.

The dissent's attempt to distinguish these cases on their facts, or on the basis that some of their discussion is dicta, is unconvincing.  "As the Supreme Court noted in *Hope v. Pelzer*, . . . an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope*, 536 U.S. at 742–44); *accord, e.g.*, *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015).  Moreover, this Court does not require "a prior, 'precise situation,' a finding that 'the very action in question has previously been held unlawful,' or a 'case directly on point'" in order to hold that a right was clearly established.  *Guertin*, 912 F.3d at 932 (citations omitted).  "In fact, under *Hope*, a requirement that a prior case be 'fundamentally' or 'materially' similar to the present case [is] too rigid an application of the clearly established inquiry." *Baynes*, 799 F.3d at 613 (citing *Hope*, 536 U.S. at 741).  Thus, under the applicable case law, we must reject the dissent's proposed qualified immunity standard because it is too rigid and unyielding.  Qualified immunity is not absolute immunity, and our case law establishes that individuals must have some right to sue government officials who knowingly or unreasonably violate their constitutional rights.

At the time of the arrest, our case law clearly established that Plaintiff had a right to be free from an arrest unsupported by probable cause. *Leonard*, 477 F.3d at 355; *accord, e.g.*, *Beck*, 379 U.S. at 91.  And we had clearly held that a single witness' unreliable accusation is insufficient to create probable cause to arrest a person without further corroboration (especially when that witness is himself a suspect, as here). *Ahlers*, 188 F.3d at 370; *Gardenhire*, 205 F.3d at 317. Moreover, it was clearly established that Officer Dottor was required to consider Maysaa's and Plaintiff's version of the events when assessing probable cause, particularly in light of the dubious nature of Mohamad's accusation.  *See Logsdon*, 492 F.3d at 342–43; *Gardenhire*, 205 F.3d at 318.  Accordingly, under the standard announced in *City of Escondido* and *Wesby*, Officer Dottor had fair notice that his arrest of Plaintiff would be unlawful in the circumstances with which he was confronted.

### 2.  Constitutional Violation

Our next step is determining whether Plaintiff has demonstrated a genuine factual dispute regarding Defendant's violation of her clearly established right to be free from false arrest under

these circumstances.  We find that she has for two main reasons.  First, she has demonstrated a genuine dispute as to whether Mohamad's account of what happened was sufficiently reliable to provide Officer Dottor with probable cause to arrest her.  This is again because Mohamad's story contained obvious falsities that should have been apparent to Officer Dottor at the time.  Mohamad said that he had stayed at the house following the incident with Hassan, but this was contradicted by Officer Dottor's firsthand knowledge.  (*See* First Case Rep., R. 26-4, Pg. ID 183, 185.)  Mohamad told Officer Dottor that Plaintiff was the aggressor, but this was contradicted by *both* of Maysaa's phone calls to the police in which she reported that her father was hitting her mother.  (*See id.* at Pg. ID 185 (stating that "Mother states son and father hit the mother"); Maysaa Dep., R. 29-3, Pg. ID 345 (stating that she reported "My dad is hitting my mom, please come fast").)

Second, even if the unreliability of Mohamad's account was not enough to create a genuine factual dispute as to probable cause, Plaintiff also alleges that Officer Dottor unreasonably ignored exculpatory evidence.  After Officer Dottor spoke with Mohamad, both Plaintiff and Maysaa explained that Mohamad was the aggressor, that he was trespassing, and that Plaintiff was acting in self-defense.  Yet Officer Dottor ignored Maysaa's and Plaintiff's accounts in favor of Mohamad's.  Officer Dottor has not offered any explanation regarding why he ignored Maysaa's account of the events.  Indeed, Maysaa was an eyewitness to the encounter and, seemingly, the person with the least bias in recounting what happened because she was not a suspect.  *See, e.g.*, *Ahlers*, 188 F.3d at 370 ("[S]ince eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity.").  This creates a factual dispute as to whether Officer Dottor reasonably ignored Maysaa's and Plaintiff's statements.

In the context of the reasons to doubt Mohamad's story discussed above, Plaintiff has demonstrated a genuine factual dispute as to probable cause sufficient to overcome Defendant's motion for summary judgment.  To be sure, at trial a jury may find that Officer Dottor is not liable to Plaintiff for false arrest.  But when construing the facts in the light most favorable to

Plaintiff and with our case law on this subject so clear, Officer Dottor is not immune from suit on Plaintiff's § 1983 false arrest claim.**[7]**

## C.  Spoliation of Evidence

In her response to Defendants' motion for summary judgment, Plaintiff raised a spoliation claim against Defendants based on their failure to preserve audio and video from their body microphones and vehicles at the time of her arrest and their failure to preserve pictures of Mohamad's alleged injury.  She asked the district court to adopt an adverse inference against Defendants.  The district court found that Defendants did in fact spoil relevant evidence, but it declined to adopt an adverse inference against them for purposes of ruling on their motion for summary judgment.  Defendants now appeal the district court's conclusion that they spoiled relevant evidence "to the extent it impacted their entitlement to qualified immunity on Plaintiff's excessive force claim."  (First Br. at 13, 25.)  Plaintiff cross-appeals, arguing that the district court should have adopted an adverse inference against Defendant Dottor when ruling on her false arrest claim.

Generally, "a party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).  We review a district court's decision not to impose a sanction for the spoliation of evidence for abuse of discretion, recognizing that

---

**[7]**On appeal Plaintiff argues that she also asserted a state law false arrest claim against Officer Dottor.  The district court did not construe Plaintiff's complaint as pleading a state law claim.  Dottor argues that Plaintiff has forfeited her state law claim, but even if she has not, he is entitled to state law governmental immunity under Mich. Comp. Laws § 691.1407.  We agree.  Unlike qualified immunity against federal claims, Michigan's governmental immunity test for state law false arrest claims includes a subjective component of bad faith.  *Odom v. Wayne County*, 760 N.W.2d 217, 228–29 (Mich. 2008). Plaintiff in the present case has not demonstrated any genuine factual dispute as to Officer Dottor's "'malicious intent, capricious action or corrupt conduct' or 'willful and corrupt misconduct.'"  *Id.* at 225 (quoting *Veldman v. Grand Rapids*, 265 N.W. 790 (Mich. 1936); *Amperse v. Winslow*, 42 N.W. 823 (Mich. 1889)).  We therefore affirm the district court's decision to the extent it dismissed Plaintiff's state law false arrest claim against Officer Dottor.

district courts have "broad discretion" to impose sanctions based on spoliation.  *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc).

We will not disturb the district court's factual finding that Defendants spoiled relevant evidence at this time because that finding did not negatively impact their entitlement to qualified immunity on Plaintiff's excessive force claim.  Instead, the district court expressly declined to adopt an adverse inference against Defendants for purposes of ruling on their summary judgment motion.  It explained: "Defendants' spoliation creates questions of material fact where those questions may not otherwise exist.  Consequently, Defendants' spoliation makes their Motion for Summary Judgment weaker on those points, as discussed below.  Given that the lack of evidence generally disadvantages Defendants in this motion, the Court finds it unnecessary to adopt an adverse inference at this time.  Should this case proceed to trial, however, the Court will address the adverse inference remedy again at that time."  *Ouza*, 2019 WL 339616, at *4.  Because the district court declined to sanction Defendants, its finding that they did in fact spoil relevant evidence was harmless.  Moreover, we are not convinced that Defendants' challenge to that factual determination is even properly before us, given that this is an interlocutory appeal from a denial of qualified immunity.  *See Mitchell*, 472 U.S. at 530 (holding that a district court's denial of qualified immunity is an appealable final decision within the meaning of 28 U.S.C. § 1291 "to the extent that it turns on an issue of law").  Instead, Defendants may appeal the district court's spoliation finding when and if the district court decides to sanction them and enters a final judgment against them at a later stage of this case.

We also decline Plaintiff's invitation to overrule the district court's decision not to adopt an adverse inference against Defendant Dottor or otherwise sanction him when ruling on his summary judgment motion with regard to Plaintiff's false arrest claim.  According to Plaintiff, the allegedly spoiled evidence would have further demonstrated a genuine factual dispute as to whether there was probable cause for her arrest, and therefore the district court should have adopted an adverse inference against Officer Dottor for purposes of ruling on his motion.  But we are now reversing the district court's grant of summary judgment in favor of Officer Dottor on Plaintiff's false arrest claim for the reasons discussed above.  As a result, Plaintiff's challenge

to the district court's failure to sanction Dottor when ruling on his summary judgment motion is moot.

### D. Municipal Liability

In her final claim, Plaintiff sues the City of Dearborn Heights pursuant to 42 U.S.C. § 1983 for failing to train and supervise its police officers. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Plaintiff alleges that Dearborn Heights did not provide *any* training to its police officers regarding the use of excessive force and handcuffing procedures prior to her arrest. It also did not provide any training regarding probable cause determinations. Plaintiff further alleges that Dearborn Heights never conducts performance evaluations for its police officers and does not otherwise supervise or monitor its officers' conduct. Dearborn Heights has not put on any evidence to dispute this. Therefore, it is not entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that the moving party bears the initial burden of showing that there is no genuine dispute of material fact on a motion for summary judgment).

A municipal policy that causes a plaintiff's constitutional injury may serve as the basis for § 1983 liability. *Brown v. Shaner*, 172 F.3d 927, 930 (6th Cir. 1999). In order to hold a municipality liable under § 1983, a plaintiff "must prove that the municipality's policy or custom caused the alleged injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 690–91); *see also Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) ("The plaintiff must 'demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" (quoting *Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997))). "One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision." *Ellis*, 455 F.3d at 700 (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Id.* In other words, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts

to deliberate indifference to the rights of persons with whom the police came into contact." *City of Canton*, 489 U.S. at 388.

There are "at least two situations in which inadequate training could be found to be the result of deliberate indifference." *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003). First, and most commonly, a plaintiff can demonstrate deliberate indifference by showing that the municipality has failed to act "in response to repeated complaints of constitutional violations by its officers." *Id.* (quoting *Shaner*, 172 F.3d at 931). Under this approach, a plaintiff must show that the defendant was aware of "prior instances of unconstitutional conduct" such that it "was clearly on notice that the training in this particular area was deficient and likely to cause injury" and yet "ignored a history of abuse." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). This is the most common way of proving deliberate indifference.

However, there is another way in which a plaintiff can show a genuine factual dispute regarding deliberate indifference. In a "narrow range of circumstances," a plaintiff can show that a municipality was deliberately indifferent by "fail[ing] to equip law enforcement officers with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409. As the Supreme Court explained in *City of Canton*, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390.

So, for example, if a municipality failed to provide any training to its officers on the use of deadly force, it would be liable to a person unconstitutionally killed by the police, given that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons" and "[t]he city has armed its officers with firearms, in part to allow them to accomplish this task." *Id.* at 390 n.10. In that situation, "the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* (internal citation omitted); *accord, e.g.*, *Shadrick v. Hopkins County*, 805 F.3d 724, 739 (6th Cir. 2015); *Cherrington*, 344 F.3d at 646. Under this approach of demonstrating deliberate indifference, a plaintiff does not need to show that the municipality had notice of a

pattern of unconstitutional conduct. *Shadrick*, 805 F.3d at 739 (citing *Connick v. Thompson*, 563 U.S. 51, 63–64 (2011)). Instead, a plaintiff can show deliberate indifference based on "single-incident liability" if the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it. *Connick*, 563 U.S. at 63.

Plaintiff in the present case premises her municipal liability claim against Dearborn Heights on this latter type of deliberate indifference.[8] She alleges that Dearborn Heights did not provide any training to its police officers regarding excessive force, proper handcuffing technique, or probable cause determinations. Dearborn Heights has not put on any evidence to dispute this, and in fact appears to concede it. Officer Derwick stated in his deposition that he had not received any training from Dearborn Heights with regard to excessive force or probable cause:

> Q.     Have you received any type of training while at Dearborn Heights Police Department with regard to use of force or handcuffing of a citizen?
>
> A.     Not specifically handcuffing. As far as use of force, I don't believe so.
>
> Q.     Have you received any training with regard to the criteria of probable cause to arrest a citizen?
>
> A.     In the police academy.
>
> Q.     How about at Dearborn Heights Police Department?
>
> A.     No.

(Derwick Dep., R. 29-5, Pg. ID 379.)

---

[8]The district court did not consider Plaintiff's evidence of deliberate indifference based on single-incident liability, even though Plaintiff clearly set forth the *City of Canton* standard in her response to Defendant's motion for summary judgment, (*see* R. 29, Pg. ID 316), and Defendant also acknowledged that a *Monell* claim need not be premised on a pattern of abuse, (R. 26, Pg. ID 133). Instead, the district court focused only on the first way of proving deliberate indifference and granted summary judgment to Dearborn Heights because Plaintiff "has not produced any evidence showing that the City of Dearborn Heights ignored a history of abuse." *Ouza*, 2019 WL 339616, at *9. This is a mistake that courts often make, given that pattern-of-abuse liability is the much more common method of proving deliberate indifference. However, we now remind courts to heed the Supreme Court's clear guidance that there are "at least two situations in which inadequate training could be found to be the result of deliberate indifference" when ruling on a municipality's motion for summary judgment. *Cherrington*, 344 F.3d at 646 (interpreting *City of Canton*, 489 U.S. at 390); *see, e.g.*, *Connick*, 563 U.S. at 63–64; *Brown*, 520 U.S. at 409–10; *see also Shadrick*, 805 F.3d at 738 (explaining that a plaintiff can show deliberate indifference on a failure to train claim "in one of two ways").

As Plaintiff points out, Officer Derwick graduated from the Police Academy in 2000, so based on his own testimony, he had not had any training on excessive force or probable cause determinations in the past fourteen years leading up to Plaintiff's arrest. Officer Dottor also acknowledged that he had not received any training on proper handcuffing technique while at the Dearborn Heights Police Department, but instead only received his handcuffing training through the Police Academy.[9]

The failure to provide any training on probable cause determinations or use of force (including handcuffing technique) is constitutionally inadequate. Given the frequency with which officers must evaluate probable cause and use force within the course of their duties, we agree with Plaintiff that Dearborn Height's complete failure to provide any type of training as to these two recurring situations may amount to deliberate indifference under *City of Canton v. Harris* and its progeny. *See, e.g.*, *Brown*, 520 U.S. at 409 ("[I]n a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." (citing *City of Canton*, 489 U.S. at 390)). Moreover, a reasonable jury could easily find that this deliberate indifference was the moving force behind Plaintiff's constitutional injuries. *See id.* at 409–10 (holding that a "high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable").

---

[9]The dissent points out that Officer Dottor stated in his deposition that he received some "field training" when he first began his employment with Dearborn Heights. (Dottor Dep., R. 29-4, Pg. ID 359.) In the dissent's view, this statement defeats Plaintiff's allegations that the City of Dearborn Heights did not provide any training to its officers on the use of force or probable cause determinations. However, we decline the dissent's invitation to *sua sponte* search the record for factual assertions that may defeat Plaintiff's claim. Dearborn Heights did not bring this statement—or any other evidence showing a training regime—to the district court's attention in its motion for summary judgment. Instead, Dearborn Heights moved for summary judgment on only two grounds: (1) that Plaintiff did not show that Officers Dottor or Derwick violated her constitutional rights, and (2) that Plaintiff failed to show a history of abuse. Dearborn Heights repeats only these arguments on appeal and does not offer any evidence of a training regime. Therefore, Dearborn Heights has forfeited any argument that it adequately trains its officers. *See Reed v. City of Memphis*, 735 F. App'x 192, 202 (6th Cir. 2018) ("[G]enerally, arguments that were not adequately raised or preserved in the district court are consequently waived on appeal."); *see also id.* at 201 ("[T]he free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not." (alteration in original) (quoting *Guarino v. Brookfield Twp. Tr.*, 980 F.2d 399, 406 (6th Cir. 1992))). And besides, even if the dissent were correct that Officer Dottor received some training from Dearborn Heights, Officer Derwick's testimony that he did not certainly creates a genuine factual dispute on this issue sufficient to overcome Defendant's motion for summary judgment.

In concluding otherwise, the dissent fails to construe the facts in the light most favorable to Plaintiff and fails to realize that we are not ruling on the ultimate issue of liability—rather, we are only evaluating whether Dearborn Heights is entitled to judgment as a matter of law. Because a reasonable jury could find Dearborn Heights responsible for Plaintiff's constitutional injuries under a theory of single-incident liability, it is not entitled to summary judgment.**[10]**

Plaintiff further alleges that Dearborn Heights failed to adequately supervise its police officers because the City does not conduct performance evaluations of its officers and it does not otherwise review or monitor the officers' conduct. And indeed, Officer Dottor testified that he had never received a performance evaluation from Dearborn Heights during his time as a police officer, and Officer Derwick likewise testified that he had never received any type of performance evaluation. Dearborn Heights has not put on any evidence that it does in fact evaluate, review, or monitor the conduct of its officers. Taken together with Plaintiff's evidence of inadequate training, this evidence further demonstrates a factual dispute as to Dearborn Height's deliberate indifference to its citizens' constitutional rights. Defendant is not entitled to summary judgment on Plaintiff's *Monell* claim.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's denial of qualified immunity to Officer Dottor and Officer Derwick on Plaintiff's excessive force claim. We **REVERSE** the district court's grant of qualified immunity to Officer Dottor on Plaintiff's false arrest claim and **REVERSE** its grant of summary judgment in favor of the City of Dearborn Heights on Plaintiff's municipal liability claim. We do not disturb the district court's rulings with regard to Defendants' spoliation of evidence. We **REMAND** the case for further proceedings consistent with this opinion.

---

**[10]**The dissent's reliance on *Marcilis v. Twp. of Redford*, 693 F.3d 589 (6th Cir. 2012), is misplaced because that case was not dealing with single-incident liability. *See id.* at 605. Unlike a deliberate indifference claim premised on a pattern of abuse, the direct causal link in a single-incident claim comes from the constitutional violation's "high degree of predictability," i.e., that the failure to train would so obviously and foreseeably result in the alleged constitutional injury. *Brown*, 520 U.S. at 409–10. This high degree of predictability supports an inference of causation in single-incident cases. *Id.*

---

### CONCURRING IN PART AND DISSENTING IN PART

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

I join the majority opinion regarding plaintiff's excessive-force claim, however regarding the false-arrest and municipal-liability claims, I respectfully dissent because I conclude the district court correctly granted summary judgment in defendants' favor. Accordingly, I respectfully concur in part and dissent in part. I would affirm the judgment of the district court.

### I.

Time and again, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam), *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018) (per curiam), *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam), *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam), the Supreme Court has admonished lower courts that broad statements of "clearly established law" do not provide the "specificity" required to put a police officer on notice that his "conduct in the particular circumstances before him" is unconstitutional, *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (citation omitted). Accordingly, when a court denies qualified immunity to a police officer on a Fourth Amendment claim, it must normally "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White*, 137 S. Ct. at 552. Because no such similar case clearly establishes defendant police officer Jordan Dottor unconstitutionally arrested plaintiff Ehsan Ouza, the majority opinion errs in denying him qualified immunity on her § 1983 false-arrest claim.[1]

### A.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). This means "the law was sufficiently clear that

---

[1]I agree with my colleagues' resolution of plaintiff's state-law based false-arrest claim.

every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). "Clearly established law" is not defined "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); rather, it "must be 'particularized' to the facts of the case," *White*, 137 S. Ct. at 552 (citation omitted). In short, "existing law must have placed the constitutionality of the officer's conduct beyond debate." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). We evaluate the state of the clearly established law at the time of the officer's conduct. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017).

Regarding Fourth Amendment claims, defining the right at issue with particularity is paramount. *Mullenix*, 136 S. Ct. at 308. "By its plain terms, the Amendment forbids unreasonable searches and seizures, yet it may be difficult for an officer to know whether a search or seizure will be deemed reasonable given the precise situation encountered." *Ziglar*, 137 S. Ct. at 1866. So "[t]he dispositive question is whether the violative nature of particular conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted).

An officer's probable-cause determination is at the center of a false-arrest claim. There is no "precise definition or quantification into percentages" of what does or does not constitute probable cause, for it "turns on the assessment of probabilities in particular factual contexts and cannot be reduced to a neat set of legal rules." *Wesby*, 138 S. Ct. at 590 (brackets and internal quotation marks omitted). Accordingly, defining a clearly established legal rule "[i]n the context of a warrantless arrest [means] the rule must obviously resolve whether the circumstances with which the particular officer was confronted constituted probable cause." *Id.* (internal quotation marks, brackets, and ellipsis omitted).

In order to properly frame this analysis, the Supreme Court has "stressed the need to 'identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment.'" *Id.* (quoting *White*, 137 S. Ct. at 552) (ellipsis omitted). Occasionally there may not be "a case directly on point." *al-Kidd*, 563 U.S. at 741. Nevertheless, "existing precedent must place the lawfulness of the particular arrest beyond debate"; that is to say, we must be able to point to "a body of relevant case law . . . to clearly establish the answer with respect to probable cause." *Wesby*, 138 S. Ct. at 590 (internal quotation marks omitted).

B.

The district court defined the right at issue as whether one may be "arrest[ed] based on the testimony of one eyewitness who has an apparent bias in the matter." The majority opinion agrees.**2** It then relies on three cases to conclude this right was clearly established at the time of plaintiff's arrest.**3** None, however, satisfy the Supreme Court's similar-circumstances mandate.

The majority opinion's lynchpin case is *Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999). That matter involved a months-long investigation by the Michigan State Police into an allegation that a corrections officer forced a detainee to engage in a sexual act in exchange for food. *Id.* at 367–68; *see also Ahlers v. Schebil*, 994 F. Supp. 856, 858–62 (E.D. Mich. 1998). The investigation eventually resulted in a prosecutor seeking and obtaining an arrest warrant for the plaintiff. *Ahlers*, 188 F.3d at 368. After the charges were dropped, the corrections officer sued the investigator for false arrest—he claimed the investigator conducted a shoddy investigation, relying too heavily on the detainee's statement to establish probable cause in the face of exculpatory evidence to the contrary. *Id.* at 369–70. It is in that context we commented that "[a]n eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Id.* at 370 (internal quotation marks omitted). And because the corrections officer could not show such information, we concluded the investigator had probable cause and therefore did not need to go looking for exculpatory evidence. *Id.* at 372.

Although *Ahlers* provides some general guidance on evaluating the totality of the circumstances when making a probable-cause determination, it plainly is not one where "an officer acting under similar circumstances was held to have violated the Fourth Amendment."

---

**2**To the extent the majority opinion holds it was clearly established that an officer may not effectuate an arrest "absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed," (Quoting *Logsdon v. Hains*, 492 F.3d 334, 343 (6th Cir. 2007)), such a broad framing is exactly the kind of "high level of generality" the Supreme Court has condemned over and over again since *Logsdon*. *See, e.g.*, *al-Kidd*, 563 U.S. at 742.

**3**In fairness, the majority opinion cites one more case, *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015). But we issued *Wesley* after the events occurred here, so it is of no value to the clearly established calculus. The same goes for plaintiff's additional case, *Al-Lamadani v. Lang*, 624 F. App'x 405 (6th Cir. 2015).

*Wesby*, 138 S. Ct. at 590 (citation and ellipsis omitted). The differences here are vast: the investigator's conduct was constitutional; it involved a months-long investigation that resulted in an arrest warrant; and the alleged problematic nature of the detainee's statement was not known to the investigator. Furthermore, *Ahlers* instructs that an eyewitness's statement—like Mouhamad Ouza's here—need not be consistent with all other available evidence when making a probable-cause determination. *See Ahlers*, 188 F.3d at 370–71; *see also Provience v. City of Detroit*, 529 F. App'x 661, 667 (6th Cir. 2013).

*Gardenhire v. Schubert* is also of no help. That case involved a store owner reporting a theft and that some of the allegedly stolen property was visible through the windows of the plaintiffs' store. 205 F.3d 303, 308 (6th Cir. 2000). Police officers recovered the property (some at the plaintiffs' store and some at their house) and detained the plaintiffs. *Id.* at 309. The plaintiffs asserted the officers falsely arrested them, claiming the officers would have discovered exculpatory evidence had they investigated further. *Id.* at 308. On this basis (and without citing *Ahlers*), we concluded that the store owner's "mere allegation that she owned the items in [the] store-front was not enough to justify an arrest" and that "[f]urther investigation was necessary at that point." *Id.* at 317. But we did so by defining the "clearly established right" in a manner inconsistent with Supreme Court precedent: "There is no question that . . . the law was clearly established that, absent probable cause to believe that an offense had been committed, was being committed, or was about to be committed, officers may not arrest an individual." *Id.* at 313 (citation omitted). And more importantly, the complaining witness's credibility was not at issue there—*Gardenhire* turned on whether her statement alone was enough to establish probable cause. *Id.* at 317.

That leaves us with *Logsdon*. Police arrested Joseph Logsdon on two separate occasions while protesting outside an abortion clinic. 492 F.3d at 338–39. In each instance, the officers responded to a clinic-employee's criminal-trespass complaint and arrested the plaintiff without conducting any further investigation (and by affirmatively refusing to "listen" to eyewitness accounts to the contrary). *Id.* On review of the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6), we concluded that these facts sufficiently stated a claim for false arrest and that qualified immunity did not apply. *Id.* at 340–44.

*Logsdon* erected three barriers to Ouza's claim.  First, it was important to our holding that the officers intentionally decided to not take the accounts of other witnesses (as opposed to not *crediting* the other witnesses' accounts here).  *Id.* at 342–43.  Second, it engages in extensive dicta as to what that case was not about—whether an officer must "entertain *any* exculpatory evidence to the contrary when they receive a call from a 'reliable source' reporting purportedly criminal activity."  *Id.* at 343.  We avoided that question given that the officers "refused to listen" to the other witnesses; yet in so doing, we emphasized that the central question to our case here—a complaining witness's credibility—was not at issue there.  *Id.*  And finally, *Logsdon* suffers from the same generic-rights definition as *Gardenhire*; indeed, it quotes the same passage from *Gardenhire* as above on what the clearly established right was.  *Id.*

There is another problem independent of lacking a similar case instructing an officer that he cannot rely on an eyewitness whose version of events might have varying degrees of consistency.  *Ahlers* and *Gardenhire* are discordant on how much credit a police officer must give an eyewitness when making a probable-cause determination.  We summarized this "tension" in *Wesley*:

> Some of our cases adopt the rule that "an eyewitness identification will constitute sufficient probable cause" because eyewitness observations are "generally entitled to a presumption of reliability and veracity."  *Ahlers*, 188 F.3d at 370; *United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006).  However, other cases take the position that an eyewitness's "mere allegation" may create reasonable suspicion justifying an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968), but falls short of creating probable cause absent some corroborating evidence of wrongdoing.  *See Gardenhire*, 205 F.3d at 317 ("Consider the following situation: a woman flags down a police officer and points out a Porsche being driven by a young man, which the woman claims is her car and which has been stolen by the man.  Would the officer have probable cause to arrest the Porsche's driver at that point?  We think not."); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 305 (6th Cir. 2005) ("A mere allegation of criminal behavior, while possibly justifying a brief investigatory detention, is insufficient by itself to establish probable cause that a crime had been committed.").

779 F.3d at 429 (brackets omitted).  This discussion demonstrates that our caselaw was unsettled on what an officer must do when considering a complaining witness's statements at the time of

plaintiff's arrest, which further shows the constitutionality of Officer Dottor's conduct was not "beyond debate."**4** *Wesby*, 138 S. Ct. at 589 (citation omitted).

C.

Qualified immunity is a "demanding standard [that] protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). No case unquestionably put Officer Dottor's decision to arrest plaintiff on the wrong side of constitutionality. At that time, our caselaw was unclear both as to (1) whether an eyewitness's statement alone is enough to establish probable cause and (2) how much credence a police officer must give to an eyewitness's account when he may have some reason to doubt at least some aspect of that account. "Tellingly," neither plaintiff nor my colleagues "have identified a single precedent—much less a controlling case or robust consensus of cases—finding a Fourth Amendment violation under similar circumstances." *Id.* at 591 (internal quotation marks omitted). Nor am I aware of a case generally holding that it is unconstitutional for an officer to rely on a complaining witness's version of events to arrest an individual when an officer *might* have *some* reason to discredit *some* portions of the complaining witness's story, let alone one involving the "complex emotional causes of behavior" that frequently accompany domestic-violence situations. *Siddle v. City of Cambridge*, 761 F. Supp. 503, 512 (S.D. Ohio 1991); *cf. Stimmel v. Sessions*, 879 F.3d 198, 208, 210 (6th Cir. 2018) (discussing its frequency and risk to officer safety). That is the precise circumstance here and caselaw requires that we defer to Officer Dottor's contemporaneous judgment call regarding the existence of probable cause when he arrested plaintiff.

Accordingly, "the unlawfulness of [Officer Dottor]'s conduct does not follow immediately" from a review of the majority's three cases, *Wesby*, 138 S. Ct. at 590 (citation

---

**4**We have subsequently tried to harmonize these cases by adopting the following dicta from *Logsdon*: "[T]he presumption of veracity applies only where the witness is 'someone with respect to whom there is *no* apparent reason to question the person's reliability.'" *Wesley*, 779 F.3d at 430 (quoting *Logsdon*, 492 F.3d at 343); *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 521–22 (6th Cir. 2016) (similar). Regardless of whether this bringing together of our divergent caselaw is correct, one thing is clear for purposes of Officer Dottor's conduct: *Wesley* and *Courtright* have no bearing on the clearly established analysis because we issued them after the events at issue here.

omitted), Officer Dottor is entitled to qualified immunity, and I would therefore affirm the district court's grant of qualified immunity to Officer Dottor.

## II.

A government entity's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). After all, "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Id.* at 67 (citation omitted). But in order to hold a city liable for the employee's unconstitutional conduct, "rigorous standards of culpability and causation" apply. *Bd. of Cty. Commr's of Bryan Cty. v. Brown*, 520 U.S. 397, 406 (1997). In failing to follow this strict command, the majority opinion has transformed plaintiff's single-incident theory into one of "*respondeat superior* liability." *Id.* at 415. Because the Supreme Court instructs otherwise, I would affirm the district court's grant of summary judgment in the City's favor on plaintiff's *Monell*-liability claim.

## A.

An essential characteristic of a failure-to-train claim is a showing more than substandard training. A plaintiff must demonstrate that the government entity's failure to train its employees in relevant respects is not merely a negligent omission; it must amount to a conscious "decision not to train certain employees about their legal duty to avoid violating citizens' rights." *Connick*, 563 U.S. at 61. "'[D]eliberate indifference' is a stringent standard of fault"; *Monell* liability applies only when a state actor has itself decided to violate the Constitution by retaining a defective training program that it constructively or actually knows causes employees to violate citizens' constitutional rights. *Id.* (citation omitted).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (internal quotation marks omitted). But in this appeal, plaintiff advances the rare exception that

is single-incident liability.**5**  It is possible—but only in a "narrow range of circumstances"—that "a failure to equip law enforcement officers with specific tools to handle recurring situations" could violate a plaintiff's constitutional rights if the infringement is "a highly predictable consequence" of the deficient training.  *Brown*, 520 U.S. at 409.  However, this rare exception to an already "tenuous" theory of liability sets an even higher bar for a plaintiff:  "the unconstitutional consequences of failing to train [must] be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Connick*, 563 U.S. at 64.

Caselaw thus demands two elements:  "It must be obvious that the failure to train will lead to certain conduct, *and* it must be obvious . . . that the conduct will violate constitutional rights."  *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017).  On the former, we consider the "adequacy of the training program in relation to the tasks the particular officers must perform"; it is not enough—on its own—to demonstrate that "a particular officer may be unsatisfactorily trained," nor may a plaintiff establish municipal liability by merely showing "an officer [could have] had better or more training."  *City of Canton*, 489 U.S. at 390–91.  On the latter, the causation element necessitates that the constitutionally deficient training "be closely related to the ultimate injury."  *Id.* at 391.  So a plaintiff must "prove that the deficiency in training *actually caused* the police officers' indifference" to her constitutional rights.  *Id.*

---

**5**Because plaintiff produced no evidence of prior incidents that would have provided notice to the City of Dearborn Heights that its training of individual line officers was both constitutionally deficient and likely to injure citizens, the district court correctly granted summary judgment in the City's favor on Ouza's *Monell* claim.  My colleagues do not contend (nor, for that matter, does plaintiff) that this was in error; instead they chastise the district court for failing to consider the alternative single-incident-liability theory.  The district court had good reason not to examine plaintiff's *Monell* claim through the single-incident prism she now presses on appeal—she did not raise that specific type of *Monell* liability below.  That would normally forfeit our consideration of the issue. *See, e.g., Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 360 n.5 (6th Cir. 2013).  However, defendants did not advance this meritorious procedural argument on appeal.  Because I am "[l]oath to raise issues for the parties, much less resolve cases on them," I would not rely on plaintiff's forfeiture to resolve this issue. *United States v. White*, 874 F.3d 490, 495 (6th Cir. 2017).  But the least we should do is not criticize the district court for making a "mistake that courts often make," as the majority opinion does, when it was plaintiff who never raised the issue in the first instance.

B.

Regarding the specifics of the *Monell* claim, plaintiff focuses on the City's reliance upon the local police academy's training program and the City's apparent lack of annual performance reviews. The majority view these practices as so deficient and generically concludes that a jury could "easily" find that this so-called obvious violation caused Ouza's injuries. I disagree in part with their factual recitation, and in whole with their legal conclusion.

On the facts, the majority opinion accurately quotes defendant police officer Gene Derwick's deposition testimony regarding his general recollection of training while employed by the Dearborn Heights Police Department. Officer Dottor, however, offered more specifics. He testified that although he received "most of [his] training in the police academy," he received "field training" and was specifically trained while employed by the Dearborn Heights Police Department on "probable cause to arrest involving a domestic violence crime." Thus, it is disingenuous to suggest that the record shows the City of Dearborn Heights lacks *any* training regime for its officers.

But even assuming it does, I disagree that the City's reliance upon training these officers received at the police academy is so obviously unconstitutional that we should attach the rarely found single-incident-liability exception. "[F]ailure-to-train liability is concerned with the *substance* of the training, not the particular instructional *format*." *Connick*, 563 U.S. at 68 (emphases added). There is no dispute that the City's officers had foundational training on probable cause and excessive handcuffing. Perhaps that foundation was unsatisfactory. Or maybe the officers' shortcomings in applying that training sprung from something other than the training program. Consider a third (and most likely) possibility—they made mistakes. Whatever the reason may be, *City of Canton* makes clear it "says little about the training program or the legal basis for holding the city liable." 489 U.S. at 391.

When a municipal employee has some training, that goes a long way in defeating a deliberate-indifference claim. *See Connick*, 563 U.S. at 67–68; *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005); *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997). Because the defendant officers received training, Ouza's real complaint here is that the City of Dearborn

Heights could have done more.  But that, alone, is not enough.  *Connick*, 563 U.S. at 68.  Rather, she must specifically identify what training (or for that matter, how conducting performance evaluations) would have prevented these defendants from engaging in unconstitutional misconduct in order to establish the City's "deficiency in training *actually caused* the police officers' indifference" to her constitutional rights.  *City of Canton*, 489 U.S. at 391.  Neither Ouza nor my colleagues do this.

The facts demonstrate why they cannot.  In addition to testifying about the training he received on effectuating a domestic-violence arrest, Officer Dottor discussed the various factors he takes into account when evaluating the totality of the circumstances when determining whether to make an arrest, including statements of those involved (and other witnesses), individuals' demeanor, the extent and nature of injuries and property damage, and whether there is a personal protection order in place.  Moreover, both officers testified *how* they were trained to place handcuffs on an individual and *what* to do if that person complains about the handcuffs being too tight.  The majority opinion disagrees with Officer Dottor's evaluation of the totality of the circumstances when he decided to arrest Ouza, and we all agree that a genuine dispute of material fact exists as to Ouza's handcuffing injuries to permit that claim to go to a jury for both officers' conduct.  But that does not mean the City of Dearborn Heights should be liable for the officers' alleged misconduct, especially when neither plaintiff nor my colleagues have identified a constitutional defect in the officers' approach to determining probable cause or how to process excessive handcuffing complaints.

With specifics lacking, generality regrettably prevails.  Plaintiff argues "constitutional law evolves" and that "[i]t is highly foreseeable that police officers will encounter situations in which they must respond to domestic violence situations, make probable cause determinations, and handcuff arrestees."  Absent record evidence establishing what specific training on these broad topics that the officers received at the police academy or argument as to how the law has evolved in these areas as it relates to Ouza's specific claims, my colleagues adopt this broad construct "[g]iven the frequency with which officers must evaluate probable cause and use force within the course of their duties."  I have no reason to dispute the premise but relying solely on it casts away the causation requirement; our precedent provides that a plaintiff must show an

explicit link between a municipality's failure to provide training and a plaintiff's constitutional injury. *See, e.g.*, *Winkler v. Madison Cty.*, 893 F.3d 877, 903 (6th Cir. 2018) ("Winkler does not identify what other . . . training she believes . . . personnel should have received."); *Zavatson v. City of Warren*, 714 F. App'x 512, 527 (6th Cir. 2017) ("While it is perhaps troubling that the City of Warren provided no formal training to Seidl with regard to gathering probable cause in order to secure an arrest warrant, or with respect to illegal search and seizure under the Fourth Amendment, there is nevertheless no evidence, beyond Seidl's own conduct, that his on-the-job training was in fact deficient." (internal quotation marks and citation omitted)); *St. John v. Hickey*, 411 F.3d 762, 776 (6th Cir. 2005) ("While St. John can point to evidence in the record tending to show that Sheriff Hickey did not provide specific training on the issue of detaining and transporting disabled and/or wheelchair-bound persons, this in and of itself does not support the conclusion that the need for such training was obvious in order to prevent violations of citizens' constitutional rights." (footnote omitted)). Devoid of such a specific link, the majority's sweeping conclusion about the City's probable-cause and excessive-force training is really just one of "because we said so" logic. Precedent demands more.

The majority opinion's afterthought conclusion of "no performance evaluations equals single-incident liability" is equally problematic. *City of Canton* requires that the City's failure to conduct routine performance evaluations of its individual officers must be "closely related" to Ouza's "ultimate injury"—her false arrest and excessive handcuffing. To my knowledge, we have never accepted a plaintiff's request to condemn a municipality's human-resources system (let alone one that is likely collectively bargained over) to the degree that my colleagues do (and in such a nonchalant and conclusory manner). On the contrary, we have universally rejected the notion that the failure to conduct a performance evaluation both causes a specific constitutional injury and reflects deliberate indifference. *See Sampson v. Village of Mackinaw City*, 685 F. App'x 407, 418 (6th Cir. 2017); *Scott v. Kent Cty.*, 679 F. App'x 435, 441 (6th Cir. 2017); *Amerson v. Waterford Tp.*, 562 F. App'x 484, 492 (6th Cir. 2014). What is it about Ouza's injuries here that are directly related to the City's failure to annually review its officers' performance? There is no connection, and the majority opinion identifies none. Yet, it approves Ouza's *Monell* claim. That does not comport with our causation caselaw. *See, e.g.*, *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 608–09 (6th Cir. 2007) (discussing requirement

that there be both cause-in-fact and proximate cause for municipal liability to attach under *Monell*).

And even if we were to put all of this aside, our precedent provided the City of Dearborn Heights with ample reason to believe its practices would survive constitutional scrutiny.  Just two years before the events at issue occurred here, we decided a nearly identical case involving the City's immediately northern neighbor, Redford Township.  In *Marcilis v. Township of Redford*, the plaintiffs similarly alleged § 1983 excessive-force and false-arrest claims and sought to hold the municipality liable for failing to train and supervise its police officers.  693 F.3d 589, 593 (6th Cir. 2012).  They supported their *Monell* claim the same way Ouza does hers: one officer "could not remember when he last received training about the use of force," the other officer "testified that his only use-of-force training took place during his time at the police academy" and that he "could not remember when he last received training on arrests and search warrants," and the municipality did not conduct performance evaluations of its officers.  *Id.* at 605.  Yet we concluded the *Monell* claim failed because the plaintiffs "failed to present probative evidence as to the question of deliberate indifference."  *Id.* (citation omitted).  True, we came to that conclusion by noting an absence of history of abuse that would have put the municipality on notice of deficient training.  *Id.*  But given those identical facts, it cannot be "so patently obvious" to the City of Dearborn Heights just two years later that its training of its officers was constitutionally abhorrent.

## C.

There is "no evidence indicating [that excessive handcuffing or arrests without probable cause] was systematic or widespread, and there [i]s no evidence that the police department's supervisory personnel sanctioned such [conduct] or even knew of its existence."  *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 574 (6th Cir. 2016).  This lack of a "direct causal link [between] the constitutional deprivation" and the officers' lack of training and performance reviews means *Monell* liability cannot attach to the City of Dearborn Heights.  *Powers*, 501 F.3d at 607.  Section 1983 simply "does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States."  *Connick*, 563 U.S. at 68.  The majority

opinion's authorization of a *Monell* claim in this instance does just that.  I would therefore affirm the district court's grant of summary judgment on plaintiff's *Monell* claim.

### III.

For these reasons, I respectfully concur in part and dissent in part.  I would affirm the judgment of the district court.